JENNIE E. MEIER AND JOHN H. MEIER, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 10278-77.     Filed August 22, 1988.

*Robert H. Wyshack,* for the petitioners.

*Charles W. Jeglikowski* and *Joyce Sugawara,* for the respondent.

GERBER, *Judge:* Respondent, in a statutory notice dated May 24, 1977, determined deficiencies and additions to petitioners' income tax as follows:

| Year | Deficiency | Sec. 6653(b) addition[1] |
|------|-----------|-------------------------|
| 1968 | $26,141.28 | $13,070.64 |
| 1969 | 1,504,622.39 | 752,311.20 |
| 1970 | 379,230.45 | 189,615.23 |

The issues for our consideration are: (1) Whether petitioners are collaterally estopped from relitigating certain facts found by the Federal District Court in an action for an accounting brought by Hughes Tool Co. against petitioner John Meier;[2] (2) whether petitioners failed to report income from the sale of mining claims to Hughes Tool Co. during taxable years 1969 and 1970; (3) whether deposits to bank accounts and cash investments made by petitioners during 1968 and 1969 constituted taxable income in those years; (4) whether any part of any underpayment of tax for the years 1968, 1969, and 1970 is due to fraud; and (5) whether the statute of limitations bars the assessment and collection of the deficiencies and additions to tax for the years 1968, 1969, and 1970.

---

[1] All section references are to the Internal Revenue Code of 1954 as amended and in effect during the years at issue. All Rule references are to the Tax Court Rules of Practice and Procedure.

[2] *Hughes Tool Co. v. Meier,* 489 F. Supp. 354 (D. Utah 1977), affd. per curiam No. 78-1565 (10th Cir., Apr. 24, 1980). "Petitioner," when referred to in the singular, refers to petitioner John Meier.

## FINDINGS OF FACT

At the time of filing their petition in this case, petitioners resided in British Columbia, Canada.

The factual predicate for this case, at least as to the mining claim transactions, is relatively simple. However, for a number of reasons, drawing the facts from the record has been an unnecessarily complicated and arduous task.[3] For purposes of clarity, a simplified macroscopic factual picture is presented prior to our detailed findings.

### *Factual Summary*

Petitioner John Meier (Meier) was employed by Hughes Tool Co. (Hughes). In that capacity, he was apparently directed to acquire silver mining claims. In derogation of his duty to his employer, Meier, through agents or co-conspirators, purchased such claims for nominal amounts, and then sold them to Hughes at immensely inflated prices. The sales proceeds were then channeled overseas, at petitioner's direction and for his benefit, to avoid detection by his employer and to avoid the incidence of the U.S. income tax.

### *Detailed Findings of Fact*[4]

The major underlying source of the determined deficiencies concern five mining transactions, namely: (1) The

---

[3]The complication and arduousness were due mainly to the parties' practical failure to stipulate to anything; respondent's almost exclusive reliance on collateral estoppel, testimony, and depositions taken in the prior Hughes Tool action which was also protracted and complex; petitioners' failure to submit proposed findings of fact on brief as required by Rule 151(e); and the convoluted manner in which the transactions took place.

[4]Prior to and at the beginning of the trial in this case, respondent moved for summary judgment based solely upon the use of collateral estoppel derived from *Hughes Tool Co. v. Meier*, 489 F. Supp. 354 (D. Utah 1977). Respondent sought to satisfy his burden with respect to the additions to tax under sec. 6653(b) for all 3 taxable years. We were not disposed to grant the motion, but chose to take it under consideration in rendering this opinion. With regard to the mining transactions, the ultimate factual findings from *Hughes Tool Co. v. Meier, supra,* are sufficient to establish that petitioner diverted his employer's funds for his own use and control during petitioners' 1969 and 1970 taxable years. However, the factual findings from that proceeding are not sufficient, standing alone, to satisfy respondent's burden of proving fraud.

The record in our case is comprised of the testimony of numerous witnesses and more than 100 documentary exhibits. Respondent offered an extensive amount of testimony in the alternative if no part of their collateral estoppel position was approved or to supplement any effective use of collateral estoppel. The testimony and documentary evidence received in this case was used in our consideration of whether respondent satisfied the burden of showing that petitioner was subject to an addition to tax under sec. 6653(b). The only findings established by means of collateral estoppel are the quoted ultimate findings from the Hughes accounting action, which appear at the end of our findings in this case. The remainder of our findings are supported by the evidence in this case.

Bogdanich sale; (2) the Hatsis sale; (3) the Belaustegui sale; (4) the Bida and Belaustegui sale; and (5) the Globe Minerals, Inc., sale. Some of the individuals involved in the mining transactions were:

Anthony Hatsis (Hatsis)—a co-conspirator of Meier, and president of Globe Minerals, a corporation involved in buying and selling mining claims.

James Cowley (Cowley)—attorney for Hatsis.

John Suckling (Suckling)—attorney for petitioner.

Charles Adams (Adams)—a tax attorney used to help plan the transfer of the sales proceeds overseas.

Robert Kahan (Kahan)—a CPA used to help plan the overseas transfers.

Joseph Foley (Foley)—attorney for Hughes.

Bogdanich, Bida, and Belaustegui—these individuals were apparently "straw men" that acquired the claims from the original owners for Meier and Hatsis and then were named as sellers in the Hughes transactions.

### The Bogdanich Sale—$2,900,000

This sales agreement was dated May 15, 1969. Most of the claims that were eventually sold through Meier to Hughes were originally sold to Bogdanich for consideration of $99,000 and 100,000 shares of Westland Minerals stock (a company controlled by Hatsis). The full consideration was never paid. These mining claims were in turn sold for $2,900,000 to CPLD, a corporate shell of Hughes used to avoid publicity. The proceeds were deposited in an escrow account with Cowley as the escrow holder. Meier acted as agent for Hughes. Of the total consideration, Bogdanich received $150,000. John Suckling was paid $900,000 which was placed in his client's trust account. Hatsis was paid $350,000. Petitioner knew of the vast disparity between the relatively nominal acquisition cost of the mining claims and the inflated sale price to Hughes.

### The Hatsis Sale—$850,000

On June 17, 1969, Hatsis purchased these claims from Columbia Investment Corp. for $25,000 and 30,000 shares of Globe Minerals stock. Under an agreement dated June

20, 1969, Hatsis agreed to sell these claims to Hughes, through Meier, for $850,000. After legal and escrow fees, the escrow holder, Continental Bank & Trust Co., distributed approximately $751,000 to Hatsis, $480,000 of which was paid to Maatschappij Intermovie, N.V. (Intermovie),[5] a Dutch corporation.

### The Belaustegui Sale—$1,500,000

Belaustegui acquired his interest in these mining claims for no consideration. Belaustegui then assigned his interest to an alleged venture of Hatsis, Belaustegui, and Everd Van Walsum (Van Walsum).[6] By agreement dated September 4, 1969, Hughes, through John Meier, purchased these claims with Belaustegui named as the seller for $1,500,000. The escrow holder issued approximately $1,497,000 to Belaustegui, who turned the money over to James Cowley, who distributed $477,000 to Hatsis and $900,000 to Van Walsum.

### The Bida and Belaustegui Sale—$1,900,000

The mining claims for this transaction were acquired for $25,000. Hatsis advanced most of the purchase price. By agreement dated October 20, 1969, Bida and Belaustegui, the named sellers, sold these claims to Hughes through John Meier for $1,900,000. The escrow holder issued $1,881,000 to the named sellers, who turned the money over to Cowley. Cowley reimbursed Hatsis for the purchase price and distributed $165,000 to Bida and Belaustegui. Cowley also distributed $1,150,000 ultimately to Intermovie and approximately $550,000 to Hatsis.

### Globe Minerals, Inc., Sale—$1,400,000

The mining claims for this sale were acquired for $57,000, advanced by Suckling from the $900,000 he had received from Meier in the Bogdanich sale.[7] By agreement dated December 2, 1969, Globe Minerals, Inc. (Globe), the named seller, sold these claims to Hughes for $1,400,000. An agent

---

[5]The role of Intermovie is discussed later in connection with the flow of the funds overseas.
[6]The role of Van Walsum is considered later in the findings regarding the transfer of the funds overseas.
[7]Suckling also sent $110,000 to Globe, and $38,000 to Bida and Belaustegui.

for Globe received $1,387,000 from the escrowee, who delivered it to Cowley, who in turn delivered it to Van Walsum.

In all the above-described transactions, the mining claims were purchased for relatively nominal consideration and subsequently sold to Hughes at greatly inflated prices. Meier, as Hughes' agent for these transactions, signed the escrow agreements in the Hatsis, Belaustegui, and Belaustegui-Bida transactions and was extensively involved in these transactions on behalf of Hughes. Petitioner also signed numerous other documents on behalf of Hughes in negotiating and consummating these transactions. Meier directly acknowledged his authority to acquire claims for Hughes and negotiated with Foley to provide a shell corporation (CPLD) to avoid publicity in the Bogdanich sale.

The total sales proceeds received from Hughes for the mining claims involved in the five transactions was $8,550,000. After reductions for escrow expenses and authorized payments, sales proceeds netted $8,401,587.72 for distribution from the various escrowees. Suckling, Intermovie, and/or Van Walsum received a total of $4,816,976.02 from the five sales, as follows:

| | |
|---|---:|
| Hatsis sale | $480,000.00 |
| Bogdanich sale | 900,000.00 |
| Belaustegui sale | 900,000.00 |
| Bida-Belaustegui sale | 1,150,000.00 |
| Globe Minerals sale | 1,386,976.02 |
| Total | 4,816,976.02 |

During the time these sales were taking place, Suckling engaged Charles Adams, Everd Van Walsum, and Robert Kahan, among others, to do some "tax planning" for Meier. While Meier could not appear, directly or indirectly, to be the owner of these funds, he undertook to retain control over these funds that were ultimately deposited into trust, or were placed under the control of other individuals or corporations for his benefit. When the initial overseas transfers took place, Meier's "advisers" did not know the source of the funds.

Hatsis told Meier that he was entitled to share with Meier in the funds that went overseas from the mining transactions. Van Walsum met with Hatsis at least 10

times about the possibilities of transferring money to Europe. Hatsis told him how it was to be divided. Van Walsum said the "set up was to get the money out of the country, and make certain investments * * * the people we were doing that for, which are Mr. Meier and Mr. Hatsis." Hatsis also told Van Walsum how much money out of every transaction was to go overseas. The group— Suckling, Adams, Van Walsum, Kahan—was working for two clients, Meier and Hatsis, who "were the final owners of the funds [handled] through the whole system."

The diversion scheme, planned by Meier and his "advisers," included the use of dormant and/or newly incorporated foreign entities. Sales proceeds from mining transactions were transferred to foreign corporations intended to appear as the owners of the proceeds. Documentation reflecting these transfers was subsequently created to corroborate the transfers. The named sellers of mining claims appeared to be acting for the foreign corporations.[8]

The funds were transferred overseas in a convoluted manner. They were first transferred to Intermovie, a Dutch corporation, to minimize taxes in the Netherlands. The funds were, in turn, transferred to Inrespro, a Bahamian corporation, to minimize Netherlands' tax. Intermovie retained a 4-percent fee for services under the pretense that it had acquired the properties sold for Inrespro.

The next step was the transfer of $1,100,000 from Inrespro to Curaçao. These funds were used to establish trusts for the benefit of Meier and his family (Meier family trust and the Calliandra trust). Even though the terms of the trust provided that the trust corpus was to revert to the Van Walsum Management Co. at the end of the 10-year term, Van Walsum considered the funds to be Meier's.

At one point during the diversion scheme, Meier became impatient and demanded payments from and increased control over the overseas assets. Meier claimed he was entitled to complete control over the overseas funds and asserted that it was "[his] money." Meier asserted control over the use of the funds as he saw fit. For example, in

---

[8]We surmise that it was intended that the mining claims would appear to be capital assets of foreign corporations not connected with a U.S. business. Accordingly, it was possible that the sales proceeds received by the foreign corporations might not have been subject to Federal income tax. See sec. 881(a).

addition to the $900,000 that Suckling received from Meier and the trust arrangements, Meier directed a foreign company (Inriego) that had received some of the funds to transfer certain money in accord with his instructions. Also, Meier met with Van Walsum during the period these transactions were taking place to arrange for the placement of the funds which insured that the funds would be for Meier's use and benefit.

In the notice of deficiency, respondent determined that petitioner did not report any of the funds diverted from Hughes and increased petitioner's income by one-half of the sales proceeds received by Intermovie, as follows:

| Sale | Sales price | To Intermovie | Petitioner's share |
|------|------------|---------------|--------------------|
| 1969 | | | |
| Bogdanich | $2,900,000 | $900,000 | $450,000 |
| Hatsis | 765,000 | 480,000 | 240,000 |
| Belaustegui | 1,500,000 | 900,000 | 450,000 |
| Bida/Belaustegui | 1,891,000 | 1,150,000 | 575,000 |
| Total | | | 1,715,000 |
| 1970 | | | |
| Globe Minerals | 1,400,000 | 1,386,976 | 540,988 |
| Total | | | 540,988 |

The one-half share of proceeds was predicated on an equal partnership with Hatsis. Petitioner did not report any income from such sales on his returns for 1969 or 1970.

In 1968 and 1969, petitioner dealt extensively in cash transactions involving the purchase of several parcels of real estate and the investment in a corporation formed to construct a convalescent home.

In 1968, petitioners deposited $62,348, $22,680 in currency, in a bank account at the Bank of Las Vegas. Petitioner also received a check for $15,000 from Basic Industries, Inc., which he deposited in an account with Irving Trust Co. Petitioners reported $48,076 and $66,399 gross income on their 1968 and 1969 returns, respectively. These amounts did not include the deposits discussed above or the funds diverted from Hughes.

On March 17, 1972, Hughes Tool Co. filed a complaint in the U.S. District Court for the Central District of Utah naming the following defendants: (1) Anthony Hatsis; (2) Toledo Mining Co.; (3) Globe, Inc.; (4) John H. Meier; (5)

John R. Suckling; (6) Charles W. Adams; (7) E.B. Van Walsum; (8) Malaga Investments, Ltd.; (9) Inrespro, Ltd.; and (10) Maatschappij Intermovie, N.V. The complaint contained, among others, the following allegations: That the "defendants conspired among themselves and with each other to sell to [Hughes] mining claims * * * for amounts of money far in excess of the value of said properties." "That defendant Meier was one of the agents of [Hughes], who was induced by defendants to forsake his fiduciary duties." The complaint goes on to allege the various sales already referred to in this opinion. The complaint concludes with the request for an accounting seeking that "each of [the] defendants should be required to account" for the "wrongful benefits * * * believed to be in excess of $8,000,000.00."

After an unsuccessful attempt to dismiss the proceeding, Meier filed an answer on June 8, 1973, generally denying most of the allegations in the complaint and asserting various defenses. Meier also attempted, unsuccessfully, to stay the proceeding pending the outcome of a criminal income tax evasion indictment outstanding against him. The reason advanced in support of a stay was based upon Fifth Amendment privilege. Ultimately, petitioner's request for a stay was denied by the Court of Appeals for the Tenth Circuit and the Supreme Court.

On December 21, 1977, Judge Aldon J. Anderson caused to be filed a "MEMORANDUM OPINION IN LIEU OF FINDINGS OF FACT AND CONCLUSIONS OF LAW [Under Rule 52(a), F.R.C.P.]." Judge Anderson's Memorandum Opinion contains a summarization of the facts and specific findings of fact and law as set forth therein. (The Memorandum Opinion is attached hereto and marked as "Appendix A.") Judge Anderson found as ultimate facts—

that * * * Meier occupied a trusted fiduciary position with [Hughes] for the acquisition of mining properties; that * * * Meier breached that duty by secretly diverting funds from the five sales to his own use and benefit and to the damage of [Hughes]; that there is no legal basis under which * * * Meier could have properly received for his own use and benefit any of such money; and that * * * Meier must account for the funds entrusted to his care in relation to these transactions. [*Hughes Tool Co. v. Meier,* 489 F. Supp. 354, 369 (D. Utah 1977).]

OPINION

## Use of Collateral Estoppel

Respondent seeks to offensively utilize the doctrine of collateral estoppel to estop petitioner from denying the diversion of funds from Hughes for his own use. Once the diversion of these funds for petitioner's use and control is established, the failure to report said amounts for Federal tax purposes may be readily shown. Respondent also attempts to utilize the diversion of funds and substantial understatement of income along with other findings from our record to, in toto, carry his burden of showing that the understatement was fraudulent. In addition to relying on the doctrine of collateral estoppel, respondent offered a substantial amount of documentary evidence and testimony.[9]

In an effort to achieve "judicial economy" we first consider whether petitioner is collaterally estopped from relitigating certain facts found by the District Court in *Hughes Tool Co. v. Meier*, 489 F. Supp. 354 (D. Utah 1977), affd. per curiam No. 78-1565 (10th Cir., Apr. 24, 1980). Collateral estoppel and the related doctrine of res judicata have the dual purpose of protecting litigants from the burden of relitigating an identical issue and of promoting judicial economy by preventing unnecessary or redundant litigation. Under the doctrine of res judicata, or claim preclusion, a judgment on the merits in a prior suit bars a second suit which involves the same parties or their privies and is based on the same cause of action. On the other hand, under the doctrine of collateral estoppel, or issue preclusion, the judgment in the prior suit precludes, in the second cause of action, litigation of issues actually litigated and necessary to the outcome of the first action.[10] *Parklane*

---

[9]Respondent advanced three alternative approaches to prove a fraudulent understatement, as follows: (1) Petitioner is estopped to deny that the District Court's findings establish fraud; or (2) fraud is established based upon collateral estoppel supplemented by the documentary evidence and testimony evidence in our record; or (3) the documentary evidence and testimony evidence in our record alone support a finding of fraud. Respondent would not prevail upon the first alternative and the second alternative was utilized to realize judicial economy.

[10]The Restatement defines the doctrine in the following manner: When an issue of fact or law is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment, the determination is conclusive in a subsequent action between the parties, whether on the same or a different claim. 1 Restatement, Judgments 2d, sec. 27 (1982).

*Hosiery Co. v. Shore,* 439 U.S. 322, 326 (1979) *(Parklane).*

Thus, collateral estoppel is used to foreclose an adversary from relitigating an issue the adversary previously litigated unsuccessfully in a different action. Until recently, however, the scope of collateral estoppel was limited by the doctrine of mutuality of parties—neither party could use the judgment as an estoppel against the other unless both parties were bound by the judgment. *Parklane* at 326-327. In *Parklane,* the Supreme Court abandoned the requirement of mutuality and sanctioned the use of collateral estoppel both offensively and defensively. Offensive use occurs when a party asserting a claim[11] (respondent herein) relies upon collateral estoppel to estop a "defendant" (petitioner herein) from denying the findings of a prior proceeding. Defensive use occurs when estoppel is interposed as a defense to "plaintiff's" claim. *Parklane* at 326 n. 4. Trial courts are given broad discretion to determine when collateral estoppel should be applied offensively. *Parklane* at 331.

In *Montana v. United States,* 440 U.S. 147 (1979) *(Montana),* the Supreme Court refined the *Parklane* parameters for use of collateral estoppel. In *Montana,* the Court used a three-prong test. First, whether the issues presented in the subsequent litigation are in substance the same as those in the first case; second, whether controlling facts or legal principles have changed significantly since the first judgment; and third, whether other special circumstances warrant an exception to the normal rules of preclusion. *Montana* at 155. See *Estate of Best v. Commissioner,* 76 T.C. 122, 134 (1981). Application of the doctrine in this manner "preclude[s] parties from contesting matters that they have had a full and fair opportunity to litigate [and] protects their adversaries from the expense and vexation attending multiple lawsuits, conserves judicial resources, and fosters reliance on judicial action by minimizing the possibility of inconsistent decisions." *Montana* at 153-154.

Collateral estoppel may be utilized in connection with matters of law, matters of fact, and mixed matters of law and fact. Historically, with regard to factual matters, a distinction was made between (1) "ultimate" and (2)

---

[11]In the setting of this case, "asserting a claim" is the equivalent of respondent's attempting to carry his burden of proof.

"evidentiary" or "intermediate" facts.[12] This distinction was made with respect to the first proceeding (in which the fact is initially found) and the second proceeding (in which one of the parties attempts to establish the same fact by means of collateral estoppel). Early case law differed over whether the facts found in the first proceeding were limited to those which were "ultimate" or included both "ultimate" and "intermediate" facts. See *The Evergreens v. Nunan,* 141 F.2d 927, 928-929 (2d Cir. 1944) (*Evergreens*).[13] In *Evergreens* at 929-931, the Circuit Court of Appeals for the Second Circuit considered, for the first time, whether the fact to be established by means of collateral estoppel in the second proceeding was likewise limited to ultimate facts in the context of the second proceeding. Although the Circuit Court did not express a preference as to whether the facts had to be found as ultimate in the context of the first proceeding, they held that the fact established must be an ultimate fact in the context of the second proceeding. *Evergreens* at 930-931. We adopted this rule in *Amos v. Commissioner,* 43 T.C. 50, 54 (1964), affd. 360 F.2d 358 (4th Cir. 1965).[14]

Contemporary case law and commentary have been critical of the *Evergreens* approach and the limitation of collateral estoppel to ultimate facts, either as taken from the first proceeding or as applied in the second proceeding. Comment j to Restatement, Judgments 2d, section 27 (1982), is especially instructive on the difficulties resulting from applying the *Evergreens* rule.

*Determinations essential to the judgment.* It is sometimes stated that when a determination is a necessary step in the formulation of a decision and judgment, the determination will not be conclusive between the

---

[12]Ultimate facts are "those facts upon whose combined occurrence the law raises the duty or right in question," while evidentiary facts are "those facts from whose existence may be rationally inferred the existence of an ultimate fact." *Amos v. Commissioner,* 43 T.C. 50, 54 (1964), affd. 360 F.2d 358 (4th Cir. 1965), citing *The Evergreens v. Nunan,* 141 F.2d 927 (2d Cir. 1944).

[13]One commentator saw this more strict interpretation as an attempt to differentiate which facts were actually litigated and necessary to the first judgment and which were not. See C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure, sec. 4424 (1981 & Supp. 1987). We do not have to address this distinction because the use of collateral estoppel in this case is limited to facts which were ultimate facts from the "first case."

[14]Although we adopted the *Evergreens* approach requiring the establishment of ultimate facts by means of collateral estoppel, our stated standard for the facts found in the first proceeding was that they be "necessary or essential to the result." We made no distinction between ultimate and intermediate facts in the first proceeding.

parties if it relates only to a "mediate datum" or "evidentiary fact" rather than to an "ultimate fact" or issue of law. It has also been stated than [sic] even a determination of "ultimate fact" will not be conclusive in a later action if it constitutes only an "evidentiary fact" or "mediate datum" in that action. Such a formulation is occasionally used to support a refusal to apply the rule of issue preclusion when the refusal could more appropriately be based on the lack of similarity between the issues in the two proceedings. If applied more broadly, the formulation causes great difficulty, and is at odds with the rationale on which the rule of issue preclusion is based. The line between ultimate and evidentiary facts is often impossible to draw. Moreover, even if a fact is categorized as evidentiary, great effort may have been expended by both parties in seeking to persuade the adjudicator of its existence or nonexistence and it may well have been regarded as the key issue in the dispute. In these circumstances the determination of the issue should be conclusive whether or not other links in the chain had to be forged before the question of liability could be determined in the first or second action.

The appropriate question, then, is whether the issue was actually recognized by the parties as important and by the trier as necessary to the first judgment. * * *

[Restatement, Judgments 2d, sec. 27 (1982). Emphasis added.]

Most recently, the Court of Appeals for the District of Columbia expressed its preference for the Restatement test over the *Evergreens* rule. *Synanon Church v. United States,* 820 F.2d 421 (D.C. Cir. 1987).[15] The court noted "many courts, including the Second Circuit itself, have ignored the *Evergreens* rule, and they have measured the scope of preclusion, not by a distinction between ultimate and mediate facts, but rather by focusing more directly on the quality and extensiveness of litigation in the first action." (Fn. ref. omitted.) *Synanon Church v. United States, supra* at 426-427. See *Wickham Contracting Co. v. Board of Education of City of New York,* 715 F.2d 21 (2d Cir. 1983); *Coward v. Colgate-Palmolive Co.,* 686 F.2d 1230 (7th Cir. 1982), cert. denied 460 U.S. 1070 (1983); *Gibson v. Missouri Pacific Railroad,* 579 F.2d 890 (5th Cir. 1978), cert. denied 440 U.S. 921 (1979); *Singer v. A. Hollander & Son,* 202 F.2d 55 (3d Cir. 1953) (ignoring *Evergreens* rule); *Phillips v. United States,* 502 F.2d 227 (4th Cir. 1974), vacated on

[15]Petitioners (Meiers) resided in British Columbia (outside of the United States) at the time of filing of their petition. Accordingly, their appeal, if any, would lie in the Court of Appeals for the District of Columbia. See sec. 7482(b)(1)(E). Further, we consider opinions of the circuit to which a case is appealable to be controlling. See *Golsen v. Commissioner,* 54 T.C. 742 (1970), affd. 445 F.2d 985 (10th Cir. 1971), cert. denied 404 U.S. 940 (1971). With respect to the *Evergreens* rule only, we will no longer follow *Amos v. Commissioner,* 43 T.C. 50, 54 (1964), affd. 360 F.2d 358 (4th Cir. 1965), irrespective of the "Golsen rule."

other grounds 424 U.S. 961, cert. denied 429 U.S. 1024 (1976); *Considine v. United States*, 645 F.2d 925 (Ct. Cl. 1981); *Overseas Motors, Inc. v. Import Motors, Ltd.*, 375 F. Supp. 499 (E.D. Mich. 1974), affd. 519 F.2d 119 (6th Cir. 1975), cert. denied 423 U.S. 987 (1975) (criticizing *Evergreens* rule). Also, recent opinions of this Court have questioned the vitality and correctness of the *Evergreens* rule. See *Peck v. Commissioner*, 90 T.C. 162, 169 (1988).

We find the reasoning in the Restatement to be the better view. Thus, we will no longer follow *Amos v. Commissioner, supra*, to the extent it prescribes a test based on "ultimate" versus "evidentiary" facts in applying the doctrine of collateral estoppel or issue preclusion.

We now consider the extent to which the doctrine of collateral estoppel may apply in this case. We first focus on the first prong of the *Montana* test, i.e., the issues decided and necessary to the decision in the Hughes accounting proceeding. *Montana v. United States*, 440 U.S. 147 (1979); *Commissioner v. Sunnen*, 333 U.S. 591 (1948). Collateral estoppel cannot apply if the party against whom it is asserted did not have a full and fair opportunity to litigate[16] the issue for which the doctrine is being asserted in the earlier proceeding. *Allen v. McCurry*, 449 U.S. 90 (1980).

Petitioner is correct in pointing out that his tax liability was not in issue in the earlier proceeding, and neither did the District Court decide whether he fraudulently omitted income. However, collateral estoppel applies to issues of *fact* or law previously litigated. *Parklane Hosiery Co. v. Shore*, 439 U.S. 322 (1979); *Montana v. United States, supra*. It is clear that the factual predicate for petitioner's diversion of funds for his own use and control and the accounting action are identical, even though the resulting legal and tax consequences might differ. Both causes of action are based on petitioner's sale of mining claims at inflated prices to Hughes. Every significant fact considered in the Hughes litigation is at issue in this case.

To better evaluate whether petitioner had a full and fair opportunity to litigate this issue in the earlier accounting

---

[16]*Commissioner v. Sunnen*, 333 U.S. 591 (1948), requires that a question of fact be "actually litigated" and "essential" to the judgment.

action we must consider the nature and purposes of such an action. An accounting is essentially an equitable remedy which is civil in nature. It is designed to prevent unjust enrichment by requiring the disgorgement of any benefits or profits received as a result of a breach of fiduciary duty. The right to an equitable accounting arises generally from defendant's possession of money or property which, because of some particular relationship between himself and plaintiff, he is obliged to surrender. 1A C.J.S., Accounting, sec. 15 (1985); 1 Am. Jur. 2d, Accounts and Accounting, sec. 50 (1962).

As with other equitable actions, plaintiff must show that his remedy at law is inadequate. *Dairy Queen, Inc. v. Wood,* 369 U.S. 469 (1962). "Before an order for an accounting is entered, a plaintiff must show that his remedy at law is inadequate, that a fiduciary relationship between the plaintiff and the defendant exists, and that plaintiff is or may be entitled to the money or property of the plaintiff that has come into defendant's hands." *Hughes Tool Co. v. Meier,* 489 F. Supp. 354, 374 (D. Utah 1977). "In a suit in accounting in equity * * * the defendant [must] account for all money or property of the plaintiff that has come into his hands." *Simper v. Scorup,* 78 Utah 71, 1 P.2d 941, 945 (1931).

Generally, there are two parts to an accounting proceeding.[17] First, the party seeking an accounting must establish a right to an accounting. Plaintiff must show an inadequate legal remedy, fiduciary relationship, and the other prerequisites noted above. If this is shown, the court will order an accounting. After this order, the second part of the action proceeds. "After the order for an accounting, interlocutory in character, is entered, the burden shifts to defendant to show that the plaintiff, in fact, is not entitled to the money or property." *Hughes Tool Co. v. Meier, supra* at 374.

The District Court found that Meier had breached his fiduciary duty to Hughes by converting Hughes' funds to his own use and control. The court ordered Meier to account

---

[17]Some court opinions and treatise material reflect that both parts may be addressed either in a single proceeding or opinion, or both. In the Hughes action, Judge Anderson first ordered that Meier was to account to Hughes and required him to do so within 30 days. Upon Meier's failure to come forward to account within 30 days, Judge Anderson entered final judgment against Meier.

to Hughes for such funds. The key element in both cases is the diversion of Hughes' funds to Meier's use and control. It is clear that Meier's motivation and purposes in defending against the allegations in the accounting action are identical to his need to show that respondent's determination that he derived income from these same transactions is in error.

The extent of the controversy here is largely due to petitioners' failure to stipulate facts as required by Rule 91.[18] Making our task even more difficult, petitioners omitted any proposed findings of fact in their brief. Moreover, petitioners filed a 15-page reply brief which did not specifically respond to nearly 80 pages of proposed factual findings set forth in respondent's 124-page opening brief. The District Court in the *Hughes* case found—

that the defendant Meier occupied a trusted fiduciary position with the plaintiff for the acquisition of mining properties; that the defendant Meier breached that duty by secretly diverting funds from the five sales *to his own use and benefit* and to the damage of his principal; that there is no legal basis under which defendant Meier could have properly received for his own use and benefit any of such money; and that the defendant Meier must account for the funds entrusted to his care in relation to these transactions. * * * . [*Hughes Tool Co. v. Meier, supra* at 369. [Emphasis added.]

There is a complete identity of factual issues in this case. Respondent must prove an underpayment exists of which some portion is due to fraud. Rule 142(b). However, as to the underlying deficiency, petitioner has the burden of showing that he did not receive the additional amounts of income determined by respondent. Also, petitioner bears the burden of proof with respect to the amount of the underpayment of his tax liability determined in the notice of deficiency. *Welch v. Helvering,* 290 U.S. 111 (1933); Rule 142(a).

---

[18]Petitioners offered to stipulate to facts found by the District Court, but withdrew their offer when respondent continued to offer into evidence exhibits and depositions from the prior trial. The District Court had the onerous task of unraveling this complicated set of facts. Petitioners have not set forth any convincing reason why we should have to go through the same process again. Most of respondent's presentation in this case consisted of testimony and depositions from the prior action. Petitioner made exactly the same objections as in the prior case, urging that the District Court's evidentiary rulings were erroneous. Petitioners' actions in making the same objections is another indicator that the issues and petitioner's motivations herein are either identical or substantially the same as those in the prior action.

Our analysis here is largely an application of familiar principles of taxation to the facts as found by the District Court. Gross income includes gains derived from dealings in property. Sec. 61(a)(3). The District Court found that Meier's agents diverted proceeds from the sale of mining claims for Meier's benefit. Because income is taxed to the true owner (*Lucas v. Earl,* 281 U.S. 111 (1930)), and the funds were handled for petitioner's benefit and control, such funds constitute income to petitioner. See *Warren v. United States,* 613 F.2d 591 (5th Cir. 1980); United States v. Pfister, 205 F.2d 538 (8th Cir. 1953); *Huntington National Bank v. Commissioner,* 90 F.2d 876 (6th Cir. 1937). Respondent, by introducing petitioners' returns, has established that petitioners failed to report this income.

Also, petitioner argues that because he validly claimed the Fifth Amendment privilege in the Hughes Tool case, he did not receive a full and fair opportunity to litigate in that action. Thus, he argues, collateral estoppel should not apply. See *Allen v. McCurry, supra.* We believe, however, despite petitioner's self-imposed testimonial incapacity, he was afforded a full and fair opportunity to litigate.

Despite invoking the Fifth Amendment, petitioner was able to vigorously defend in the District Court action. He thoroughly cross-examined witnesses, either in depositions or at trial. He made numerous objections to the testimony offered by Hughes. He moved, on various occasions, to dismiss for lack of jurisdiction, for a stay pending an outcome in the criminal case, and for the trial judge to recuse himself. He appealed to the Court of Appeals for the 10th Circuit based on alleged errors in the holding of the District Court. In short, he used all the legal and procedural means available to him to defend in the accounting action.[19] Petitioner was unsuccessful in the District Court accounting action not for lack of an opportunity, but on the substantial weight of the factual evidence presented against him. Indeed, the question of whether petitioner had diverted the funds to his own use and control was an essential issue in

---

[19]The Court of Appeals for the Tenth Circuit went so far as to describe petitioner's tactics as "dilatory." *Hughes Tool Co. v. Meier,* No. 78-1565 (10th Cir., Apr. 24, 1980) (slip op. p. 2). In addition, it has come to the Court's attention that petitioner was convicted of obstruction of justice by knowingly submitting false documents to the District Court in the Hughes action. See *United States v. Meier,* 484 F. Supp. 1129 (D. Utah 1980).

the accounting action, as well as in the criminal indictment for evasion and the issues in this civil tax case. Moreover, petitioner's loss in defending the accounting action or this proceeding would not collaterally estop him in a criminal proceeding. In the context of discussing collateral estoppel, we must also assume, as the District Court did when petitioner raised the Fifth Amendment issue in *Hughes Tool Co. v. Meier, supra* at 374, that " 'the prevailing rule' in *Baxter v. Palmigiano,* 425 U.S. 308 (1976), [is] that 'the Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them.' " See also *Singleton v. Commissioner,* 606 F.2d 50, 52 n. 3 (3d Cir. 1979), affg. a Memorandum Opinion of this Court.[20]

Petitioner's position seems to be that there can never be a full and fair opportunity to litigate in a civil case so long as there is a related criminal action pending. Petitioner misapprehends the scope of the Fifth Amendment privilege. The Fifth Amendment protects against *compulsory* self-incrimination. *Fisher v. United States,* 425 U.S. 391 (1976). However, it does not prevent an accused from testifying, and the privilege may be waived. *Raffel v. United States,* 271 U.S. 494 (1926). In both civil and criminal actions, a party having the privilege must weigh the benefits of his testimony against the possibility of giving incriminating evidence in discovery, or on direct or cross-examination. See *Barnes v. United States,* 412 U.S. 837 (1973); *Raffel v. United States, supra.* Thus, as part of a party's litigating strategy, there is a choice of whether or not to testify. It was petitioner's choice whether or not to avail himself of this opportunity. Petitioner asserted the privilege and must bear the consequences of such action. Moreover, while the amendment prevents self-incrimination, it does not prevent testimony by others. See *California Bankers Association v. Shultz,* 416 U.S. 21 (1974); *Couch v. United States,* 409 U.S. 322 (1973).

It appears that petitioner may have benefited from asserting the privilege, rather than it impairing his opportu-

---

[20]Petitioner has not referred us to any cases which hold that simultaneous civil and criminal actions deprive an individual of a full and fair opportunity to litigate in either case. Additionally, the District Court and Circuit Court of Appeals for the 10th Circuit refused to stay the accounting action on the same Fifth Amendment grounds.

nity to litigate. Petitioner, in the Hughes accounting action, could validly refuse to answer interrogatories and deposition requests, and would not be compelled to produce documents. Hughes had to obtain materials and testimony from third parties.

Petitioner also refused to testify in the present case, based on the Fifth Amendment privilege. In the absence of new facts that might have been brought to light had petitioner testified in this case, there is nothing to suggest a different factual result. In addition, petitioner was afforded the opportunity in this case to bring in testimony by others supporting a theory that Hughes consented to the sales, or any other admissible evidence he wished to offer. In short, petitioner's asserting the Fifth Amendment privilege did not impair his ability to litigate in the District Court or in this Court. The adverse result in the prior action was based upon the overwhelming evidence presented against petitioner.

The second prong of the *Montana* test is whether the controlling facts and legal principles have changed significantly since the first action. We find that there have been no such changes. As previously discussed, collateral estoppel in this case relates primarily to factual issues, thus the legal principles are largely unaffected. The factual underpinnings of the earlier action are identical to the present proceeding. The only factual matter that may differ is a claimed defense of petitioner in this case. Petitioner alleges that Howard Hughes authorized such transactions at the behest of the Central Intelligence Agency. We left the record open for the deposition testimony of respondent's former agent Kaminski, whom petitioner contends would substantiate his claim.[21] Petitioner failed to advance any testimony or other evidence in support of such claims during the trial or within the extended time that the record was left open. Thus, the second prong of the test has been met.

The third prong of the *Montana* test is whether there are any special circumstances that would warrant exception to

---

[21] In the District Court case, Meier also attempted to show that his activities were not on behalf of Hughes but instead that he was acting on behalf of a Mr. Maheu. That claim was summarily rejected by the District Court judge and did not meet with any success in diverting the Court's attention from the facts proven by Hughes.

the normal rules of preclusion. Petitioner has not presented any such circumstances. Petitioner had ample incentive to litigate, both here and in the District Court, because of the large amounts of money involved. In addition, the waste of judicial resources occasioned by the retrial of identical factual issues mitigates against petitioner.

Petitioners rely upon two Memorandum Opinions of this Court in further support of their contention that collateral estoppel should not apply. In *Cipparone v. Commissioner,* T.C. Memo. 1985-234, it was held that a conviction in State Court for bribery did not collaterally estop the taxpayer from litigating the amount of money received, because mere benefit, not receipt of any specific amount of money, was all that was necessary to a conviction under the statute.[22] Because respondent failed to prove that the taxpayer *actually* received any money, we declined to sustain the fraud addition. Petitioner's reliance on this opinion is misplaced. In the instant case, the District Court clearly found that petitioner, through his agents, diverted substantial amounts of money for his own benefit and control. In addition, the crux of an accounting action is that plaintiff is entitled to a specific amount of money that has come into the defendant's hands. *Hughes Tool Co. v. Meier,* 489 F. Supp. 354, 374 (D. Utah 1977).

Petitioners' reliance on *Mosteller v. Commissioner,* T.C. Memo. 1986-505, also is misplaced. In that case, we declined to sustain the fraud addition based upon the taxpayer's conviction of larceny by false pretenses in a bid-rigging scheme. There we stated "Mere evidentiary facts in the criminal case, as opposed to ultimate facts, would not be established in this case under the principle of collateral estoppel by judgment." Because we have declined to place emphasis on the ultimate/evidentiary distinction in applying collateral estoppel, this rationale is not controlling in the instant case. In any event, Meier has chosen to put every fact in issue. Considerations of judicial economy should preclude petitioner from relitigating those issues of fact previously found. In addition, in *Mosteller,* respondent failed to establish by clear and convincing evidence that amounts received in the bid-rigging scheme were not in fact

---

[22]The taxpayer was collaterally estopped from denying participation in the bribery scheme.

reported. In this case, it has been established that the items creating the underpayments were not reported on petitioners' income tax returns.

We accordingly hold that petitioner is collaterally estopped from denying the facts which support the finding that he had diverted funds from Hughes to his own use and control, as found by the District Court.

## Evidentiary Objections

We next address the considerable evidentiary objections petitioner made both at trial and on brief. During trial, petitioner made innumerable objections based, for the most part, on relevancy and hearsay.[23]

Petitioner objected to the relevancy of most of the evidence offered by respondent. Apparently, petitioner's relevancy objections are based on the assertion that petitioner was not involved with the transactions at all. Relevant evidence is evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. Fed. R. Evid. 401. The evidence submitted by respondent in this action tends to implicate petitioner in the scheme to defraud both Hughes and the Federal Government. We will not reward petitioner for his skill in hiding his role in the project. Moreover, the opinion of the District Court shows that petitioner was involved in the above-described activity. Thus, petitioner's relevancy objections are not well founded.

The next set of objections involves the hearsay rule. Respondent sought to introduce transcripts of trial testimony and depositions from the earlier proceeding. This evidence is admissible under Rule 804(b) of Federal Rules of Evidence because it was shown that the declarants were unavailable to testify in this proceeding. In addition, because the factual predicate for both cases is identical, petitioner had the same motive and opportunity to develop both direct and cross-examination.[24] Moreover, because of

---

[23]As we previously stated with respect to the collateral estoppel issue, petitioner made identical objections here as in the prior action. We meticulously ruled on these objections, substantially agreeing with the District Court Judge.

[24]Three-fourths of one deposition is solely cross-examination by petitioner's counsel.

the lapse of time, this evidence might be more reliable than contemporaneous "live" testimony.

Concerning the hearsay objections, Rules 801(d)(2)(C), (D), and (E), and 803(6) of Federal Rules of Evidence, provide the basis for compliance with and/or exception to the hearsay rule concerning the questioned documents. Most of the records in question concerned the "business" transactions between Hughes, petitioner, and the other related individuals and entities, which included named businesses and trusts. The documents are, accordingly, either admissions by petitioner's agents, statements by petitioner's "co-conspirators" or "business records." Due to the macroscopic or "broad brushed" nature of petitioner's presentation (including his objections), both at trial and on brief, we are not compelled or disposed to address each document individually.

The final category of objections involves documentary evidence. Petitioner stipulated that some of the documents were authentic, but reserved hearsay and relevancy objections. The relevancy objections were identical to those posed in connection with the testimony and are disposed of on the same grounds as the testimonial objections. Fed. R. Evid. 401. Following a pattern, petitioner asserted a barrage of hearsay and authenticity[25] objections to most of the documents offered by respondent.

As to the authenticity objections, respondent relies on the former recorded trial testimony and depositions of petitioner's agents and "co-conspirators" in the mining transactions to authenticate the documents. We are satisfied, from our reading of the former testimony and the interrelationship of the documents, that these documents were adequately authenticated and tested.[26]

---

[25]Most, if not all, of the documents were objected to on the hearsay ground, but there was a group (labeled as "A" documents) to which petitioners did not pose authenticity objections.

[26]Because of the reliance upon collateral estoppel and the substantial effect that it has upon the findings in this case, our reliance upon the questioned documentary evidence is lessened. The documents generally provide corroborative or transitional support for our findings. Most factual findings would stand without reference to the documents which were questioned as to authenticity, hearsay, and relevance (referred to as category "C" documents at trial). See also note 4 *supra.*

## Income From Mining Transactions
## and Reconstruction of Income

We now consider whether petitioner derived income from the Hughes' mining transactions in 1969 and 1970. Gross income includes all income from whatever source derived, including gains from dealings in property. Sec. 61. Income is taxed to the person who owns it. *Lucas v. Earl*, 281 U.S. 111 (1930). While the funds were nominally in the hands of other individuals or entities, the District Court found that the sales proceeds were in the practical control of petitioner through his agents. Based upon the ultimate findings of fact by the District Court, petitioner is estopped from denying he derived taxable income from the mining transactions. This is true whether income is defined as a gain derived from dealings in property, sec. 61(a)(3), or as an "accession to wealth, clearly realized, over which the [taxpayer has] complete dominion." *Commissioner v. Glenshaw Glass Co.*, 348 U.S. 426 (1955). Because petitioner asserted control over the diverted funds that were used for his benefit, he is properly taxable on that income.[27] This is so even though the money was diverted illegally and petitioner had an obligation to account for the money. *James v. Commissioner*, 366 U.S. 213 (1961).

Petitioner argues that there is no adequate foundation for asserting that he understated his income, and further, that the evidence establishes that Hatsis was the architect of the entire scheme. Therefore, none of the funds should be attributed as income to him. Petitioner also attacks the correctness of the determination that there was an equal partnership with Hatsis. Petitioner's arguments are unsupported by this record (and are at odds with the ultimate findings of the District Court).

With respect to transactions other than the mining transactions in 1968 and 1969, respondent increased petitioners' income based on amounts of cash deposits[28] and other cash expenditures. Petitioners argue that this method

---

[27]Even if the funds had been obtained with the consent of his employer, petitioner's taxability on such amounts would be unaffected.

[28]Cash bank deposits are just another form of cash expenditure. Cf. *Estate of Mason v. Commissioner*, 64 T.C. 651 (1975), affd. 566 F.2d 2 (6th Cir. 1977) (bank deposits are prima facie evidence of income).

is invalid, and respondent must use a net worth method of reconstruction, requiring beginning and ending net worth computations, which respondent has not proven. See *Holland v. United States,* 348 U.S. 121 (1954).

The net worth method of reconstructing income is not the only method available to respondent. The Supreme Court, in *United States v. Johnson,* 319 U.S. 503 (1943), authorized the use of the cash expenditures method. This method was described in *DeVenney v. Commissioner,* 85 T.C. 927, 930-931 (1985), as follows:

> The cash expenditures method is based upon the assumption that the amount by which a taxpayer's cash expenditures during a taxable period exceed his known sources of income for that period is taxable income, unless the taxpayer can show his expenditures were made from some nontaxable source of funds. A proposed deficiency determined by use of the cash expenditures method is presumptively correct, and the burden of proof is upon the taxpayer to demonstrate otherwise. *Welch v. Helvering,* 290 U.S. 111 (1933); Rule 142(a); *Burgo v. Commissioner,* 69 T.C. 729, 743 (1978). To meet this burden, petitioners must prove either that someone else made the expenditures or that the funds used were obtained from nontaxable sources, e.g., loans, gifts, inheritances, or assets on hand at the beginning of the taxable period. [Citations omitted.]
>
> In *Holland v. United States,* [*supra*], the Supreme Court sanctioned use of the net worth method of income reconstruction subject to certain safeguards. This method is substantially analogous to the cash expenditures method. The Supreme Court's safeguards may be summarized as follows:
>
> (1) Respondent must track down relevant leads which might show alternative sources of nontaxable income if such leads are reasonably susceptible to being checked, and
> (2) respondent must give proof of a likely source of taxable income.
>
> Thus, the  * * *  satisfaction of the safeguards enumerated above [must be determined] in light of the facts and circumstances known to [respondent] subsequent to the filing of the petition.

Thus, petitioners' position that the cash expenditures method is not valid is incorrect. Before the safeguards in *Holland* are triggered, petitioner must either explain the source of or provide alternative nontaxable sources for the discrepancy in his expenditures and his reported income. This explanation commences respondent's investigative requirements under *Holland.*[29] Petitioner failed to provide any

---

[29]Respondent need not negate all the possible nontaxable sources of income advanced by taxpayers. *Holland v. United States,* 348 U.S. 121, 138 (1954).

explanations for such discrepancy which would require respondent's investigation. We hold that petitioners failed to carry their burden of proving they did not understate their income as determined by respondent in the notice of deficiency.

### Fraud/Section 6653(b) Addition

Respondent argues that petitioner's failure to report diverted funds and other income on his tax returns for 1968, 1969, and 1970 is fraudulent. If any part of any underpayment for the taxable years is due to fraud, the addition under section 6653(b) will apply, not only to the underpayment attributable to fraud, but to the entire underpayment. Fraud must be proved by clear and convincing evidence. Sec. 7454; Rule 142(b). The existence of fraud is a question of fact to be resolved upon consideration of the entire record. *Gajewski v. Commissioner*, 67 T.C. 181 (1976), affd. without published opinion 578 F.2d 1383 (8th Cir. 1978); *Mensik v. Commissioner*, 328 F.2d 147 (7th Cir. 1964), affg. 37 T.C. 703 (1962), cert. denied 379 U.S. 827 (1964). Fraud is never presumed, but rather must be established by some independent evidence. *Beaver v. Commissioner*, 55 T.C. 85 (1970). Fraud may be proven by circumstantial evidence and reasonable inferences drawn from the facts because direct proof of the taxpayer's intent is rarely available. *Spies v. United States*, 317 U.S. 492 (1943); *Rowlee v. Commissioner*, 80 T.C. 1111 (1983); *Stephenson v. Commissioner*, 79 T.C. 995 (1982), affd. 748 F.2d 331 (6th Cir. 1984). The taxpayer's entire course of conduct may establish the requisite fraudulent intent. *Rowlee v. Commissioner, supra; Stone v. Commissioner*, 56 T.C. 213 (1971).

In a recently decided case, *Bradford v. Commissioner*, 796 F.2d 303 (9th Cir. 1986), affg. T.C. Memo. 1984-601 (*Bradford*), the Court of Appeals for the Ninth Circuit reaffirmed that it is appropriate to infer fraudulent intent from various kinds of circumstantial evidence and set forth a nonexclusive list of the "badges of fraud" that demonstrate fraudulent intent. These include: (1) The understatement of income; (2) inadequate records; (3) failure to file tax returns; (4) implausible or inconsistent explanations of

behavior; (5) concealment of assets; and (6) failure to cooperate with tax authorities. The following are additional indicia of fraud: (1) Engaging in illegal activities; (2) attempting to conceal these activities; (3) dealing in cash; and (4) failing to make estimated tax payments. *Bradford v. Commissioner, supra* at 307-308.

Respondent has established that Meier's returns for the years involving the mining transactions were fraudulent. The first indicia of fraud in *Bradford* is understating income. We have already found that petitioner diverted funds of Hughes to his own use and control and that said funds constituted substantial income from the mining transactions during the 1969 and 1970 taxable years. Through introducing petitioners' returns into evidence, respondent has shown the failure to report any of this income. The failure to report said income resulted in large understatements of income on petitioners' 1969 and 1970 joint returns.

Part of the evidence relied upon by respondent to carry his burden of establishing fraud has been established through the offensive use of collateral estoppel. Accordingly, we must consider the burden of proof required in both proceedings. Civil tax fraud must be proven by clear and convincing evidence. Sec. 7454; Rule 142(b). Section 27, Restatement, Judgments 2d (1982), and the holding in *Synanon Church v. United States,* 820 F.2d 421 (D.C. Cir. 1987), state the general rule that a fact found in a first case may be established by means of collateral estoppel either as an evidentiary or ultimate fact in the second case. Subsection (4) of section 28, Restatement, Judgments 2d (1982), recommends an exception in the following circumstances where "The party against whom preclusion is sought had a significantly heavier burden of persuasion with respect to the issue in the initial action than in the subsequent action; the burden has shifted to his adversary; or the adversary has a significantly heavier burden than he had in the first action."[30] Accordingly, we consider the standard of proof

---

[30]We are not certain whether the Restatement's recommended exception would apply equally to facts which are established as "evidentiary" in the second case. Where an evidentiary or ultimate fact from the first case is used as an ultimate fact in the second (without further evidence) a comparison of the degree of the burden of proof would be necessary. In a setting where a collaterally estopped fact is merely a part of the evidence considered to determine

for an accounting action brought in a Federal District Court in Utah.

As previously indicated, plaintiff in an accounting action must show that through fraud or breach of a fiduciary duty, or both, he is entitled to money or property held by the defendant. There is no explicit burden of proof for accounting actions in Utah. However, where fraud is alleged it must be proven by clear and convincing evidence. *Holland v. Moreton,* 10 Utah 2d 390, 353 P.2d 989 (1960); *Lynch v. MacDonald,* 12 Utah 2d 427, 367 P.2d 464 (1962).

Fraud and breach of fiduciary duty can be separate bases for instituting an accounting action. An agent commits a breach of his fiduciary duty if he sells property to or buys property from his principal without full disclosure to his principal. *Tatsuno v. Kasai,* 70 Utah 203, 259 P. 318 (1927).[31] See also Restatement, Agency 2d, secs. 387-389 (1957). It would appear that such a breach becomes fraudulent when accompanied by intentional nondisclosure and bad faith. See comment "a" to Restatement, Agency 2d, section 389 (1957). Conduct similar to that of petitioner's has been found to be fraudulent by Utah courts in several cases.

*Tatsuno v. Kasai, supra,* involved the defendant's acting as agent for the purchase and sale of mining stocks by the plaintiff. In that case, plaintiff directed defendant to sell the stock at $4 per share. Defendant, without selling the stock, remitted $4 per share to the plaintiff, and subsequently sold the stock for $4.07 per share. Defendant also sold to plaintiff shares belonging to defendant for $1 per share when the market price was $0.75 per share. Plaintiff commenced an accounting action. The trial court concluded that the purported sales and purchases were fraudulent and voidable. The Supreme Court of Utah affirmed, noting the duty of honesty between principal and agent, and stated that it was "clearly shown * * * [that defendant] took plaintiff's stock in breach of his trust for his own use and

whether a party has met his burden of proof, the need for an equal or higher burden of proof in the first case is less obvious. We do not have to address this nuance because the burden of proof in both cases under consideration is by "clear and convincing evidence."

[31]Comment "a" to sec. 389 of the Restatement, Agency 2d (1957), indicates that "an agent who is appointed to sell or give advice concerning sales violates his duty if, without the principal's knowledge, he sells to himself or purchases from the principal through the medium of a 'straw.' "

benefit and to the injury and detriment of the plaintiff." *Tatsuno v. Kasai*, 259 P. at 322. The court also held that in such circumstances a fiduciary or trust relationship is involved, which is more than a principal and agent relationship.

In *Holland v. Moreton, supra*, plaintiff granted defendant a one-fourth interest in certain unpatented mining claims in exchange for defendant's acting as agent to patent and sell the claims. Defendant colluded with the purchaser, and agreed to sell plaintiff's three-fourth's interest at $100,000, while defendant sold his interest to the purchaser for $287,000. When plaintiff discovered this, he commenced an action for fraud. The trial court vacated a jury verdict in favor of plaintiff, including punitive damages for fraud. The Supreme Court of Utah reversed, reinstating the jury verdict.[32]

*Lynch v. MacDonald, supra*, like *Tatsuno v. Kasai, supra*, was an action for an accounting. In that case, a joint venture was formed to purchase oil and gas leases. One of the joint venturers, a geologist, found such properties at a price of $4 per acre. He informed the seller that the venture was interested in the properties and that he had quoted the venture a price of $7 per acre, rather than $4; the $3 differential was to be paid to him without the knowledge of the other participants of the joint venture. The trial court ordered an accounting, finding that the joint venture was the victim of a fraud perpetrated by the geologist and aided and abetted by the seller. The Supreme Court of Utah affirmed, finding that fraud was established "by clear, satisfactory, and convincing proof" and that all of the essential elements of actionable fraud were present.

The trial court in the Hughes case did not state with acuity the standard of proof it used. Although fraud was not expressly alleged, Hughes contended that Meier was its agent in the acquisition of mining claims, that Meier abandoned his fiduciary duty to Hughes and, together with others, sold the mining claims to Hughes at inflated prices and secretly participated in the redistribution of money to

---

[32]The dissenting opinion did not think that the facts were shown by clear and convincing evidence, as was necessary in a fraud case, quoting *Pace v. Parrish*, 122 Utah 141, 247 P.2d 273 (1952).

and for the benefit of defendant Meier and others. *Hughes Tool Co. v. Meier,* 489 F. Supp. 354, 359 (D. Utah 1977).

All of the classic indicia of fraud are present in the Hughes case; a misrepresentation by Meier about the price and/or value of the mining claims, in addition to concealing his role on both sides of the transaction, reliance on his representations by Hughes, and damage to Hughes. See *Pace v. Parrish,* 122 Utah 141, 247 P.2d 273 (1952). The facts of this case are strikingly similar to those in *Tatsuno v. Kasai, supra; Holland v. Moreton, supra;* and *Lynch v. MacDonald, supra.* The District Court in *Hughes Tool Co. v. Meier, supra,* found that Meier held a fiduciary position, that he breached such position by secretly diverting funds from the sales for his own use and benefit and to the damage of his principal, and that there was no basis upon which he could keep the funds. Under these circumstances, plaintiff (Hughes) established fraud through the breach of Meier's fiduciary duty.

The District Court in *Hughes Tool Co.* used language in its opinion indicating that the quantum of proof would have, at a minimum, met a clear and convincing standard. The Court held as follows: "In view of the foregoing findings, the court concludes as a *matter of law* defendant Meier must  *  *  *  render an accounting." *Hughes Tool Co. v. Meier, supra* at 369. Emphasis supplied.

Defendant Meier appears to misapprehend the quantity and quality of the evidence which has been presented in this case to date  *  *  * . As the court rehearsed in great detail  *  *  *  there is substantial evidence in the record upon which to base a ruling fixing liability on defendant  *  *  * . That is, plaintiff established [the sales transactions and that the funds were the responsibility of Meier]. [*Hughes Tool Co. v. Meier, supra* at 373.]

"The court is of the opinion that *all* of the evidence in this matter shows that the sum of  *  *  *  is due the plaintiff." *Hughes Tool Co. v. Meier, supra* at 374. Although not entirely clear, we conclude that the standard of proof required in this type proceeding in Utah is "clear and convincing." Based upon our review of Judge Anderson's opinion and the record[33] in the District Court proceeding,

---

[33]Most of the documents and testimony received in the District Court were offered and received in this case.

we believe that Hughes Tool was held to a "clear and convincing" standard of proof in establishing that Meier, through a breach of his fiduciary duty, secretly diverted Hughes' funds for his own use and control.

Another indicia of fraud in *Bradford* is the failure to keep records or keeping inadequate records. In this case, many of the documents were back-dated or dated "as of" a certain date, to retroactively reflect the transactions in the light petitioner wanted them to appear, i.e., making the foreign corporations the owners of the claims. Additionally, Meier's role on both sides of these transactions is not reflected in the records (of necessity, to conceal his involvement). In the context of this case, the records of the transactions are inadequate and were intended, at the very least, to conceal information from petitioner's employer and likely from the taxing authorities, including respondent.

Another indicia noted in *Bradford* is the concealment of assets. This is a highly probative factor here. The sales proceeds were almost immediately transferred overseas after the execution of the transactions. In addition, the documentation makes it appear that the foreign corporations were the owners of the funds, while the funds were under the control of and for the benefit of petitioner. We find it highly indicative of fraudulent intent that the funds, after being channeled through two different foreign corporations, ended up in a trust for the benefit of petitioner. This conduct, calculated to mislead and conceal, is indicative of fraud. *Spies v. United States,* 317 U.S. 492 (1943). *Gajewski v. Commissioner,* 67 T.C. 181 (1976), affd. without published opinion 578 F.2d 1383 (8th Cir. 1978).

Petitioner contends that his so-called "fraudulent intent," because of the transfer of funds, was merely "tax planning" by a group of knowledgeable advisers. We find that the use of the foreign entities, in the context of this case, was a sham or subterfuge to disguise the real owner, avoid identification of petitioner, and to evade Federal income taxes.

A final factor relevant here is whether the activity was illegal. While we know of no State criminal charges filed in connection with this case, petitioner rather egregiously breached his fiduciary duty to his employer, to the extent of

benefiting by several million dollars. We find that this situation is not significantly different than a case involving embezzlement or other kind of theft. The lack of potential for criminal punishment or penalty seems to be a distinction without a difference in this setting; petitioner's activities are no less illegal or improper.

Respondent need not prove the precise amount of the underpayment resulting from fraud. *Otsuki v. Commissioner,* 53 T.C. 96, 105 (1969). In any event, some amount of underpayment has been established for the years 1969 and 1970. We conclude, therefore, based on the facts in the record, that petitioner intended not only to conceal his activities from his employer, Hughes, but also fraudulently intended to evade Federal income tax.[34]

## Statute of Limitations

The next issue involves the statute of limitations on assessment. The notice of deficiency was mailed more than 3 years after the filing of the returns for the years at issue. See sec. 6501(a), (b)(1). However, in the case of a false or fraudulent return filed with the intent to evade tax, the tax may be assessed at any time. Sec. 6501(c)(1). Petitioner is subject to the section 6653(b) addition for 1969 and 1970 because there were fraudulent understatements. Therefore, we hold that the statute of limitations does not bar assessment and collection of tax for 1969 and 1970. The statute of limitations does, however, act as a bar to assessment or collection of the tax due for the 1968 taxable year. Respondent has not proven an addition for fraud for 1968 nor has any other defense regarding the statute of limitations been proven by respondent.

---

[34]Although neither party brought this matter to our attention, it is obvious that respondent has only proven that petitioner-husband fraudulently intended to evade Federal income tax. Sec. 6653(b), in part, provides: "In the case of a joint return under sec. 6013, this subsection shall not apply with respect to the tax of a spouse unless some part of the underpayment is due to the fraud of such spouse." Respondent has not shown that any part of the underpayment is due to fraud on the part of petitioner-wife (Jennie E. Meier). The addition to tax under sec. 6653(b) is not applicable to petitioner-wife for any of the 3 taxable years in issue. However, petitioner-wife has not otherwise alleged or proven that she is an "innocent spouse" within the meaning of sec. 6013 for any of the 3 taxable years in issue. Thus, petitioner-wife is jointly and severally liable with petitioner-husband for the income tax deficiency, but she is not liable for any addition to tax under sec. 6653(b). *Stone v. Commissioner,* 56 T.C. 213 (1971).

Respondent has determined that petitioner underreported his income for 1968 because petitioner's bank deposits exceeded his reported income by approximately $29,000.[35] In addition, petitioner engaged in large numbers of cash transactions during 1968, 1969, and 1970. *Bradford v. Commissioner,* 796 F.2d 303 (9th Cir. 1986), affg. T.C. Memo. 1984-601. However, for taxable year 1968, respondent has not established the quantum of evidence sufficient to prove fraud and thereby lift the bar of the statute of limitations. While the Hughes episode provided highly probative evidence of fraudulent intent for 1969 and 1970, this does not flow to years unrelated to those transactions. This finding renders moot respondent's determination that petitioner omitted interest income and other items of income for 1968.

To reflect the foregoing,

> *Decision will be entered for the respondent in part and the petitioners in part.*

Reviewed by the Court.

NIMS, CHABOT, PARKER, WHITAKER, KÖRNER, SHIELDS, HAMBLEN, CLAPP, SWIFT, JACOBS, WRIGHT, PARR, WILLIAMS, WELLS, RUWE, and WHALEN, *JJ.,* agree with this opinion.

---

Appendix A begins
on page 305.

---

[35]Respondent also included other amounts in petitioner's income, a $9,000 cash insurance premium payment, $137.25 of interest income, and approximately $7,000 without a designated origin.

APPENDIX A

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH
CENTRAL DIVISION

Filed in United States
District Court,
District of Utah
Time DEC 21 1977
PAUL L. BADGER
Clerk

HUGHES TOOL COMPANY
(now Summa Corporation),
Plaintiff,

v.

JOHN H. MEIER, et al.,
Defendent.

MEMORANDUM OPINION
IN LIEU OF
FINDINGS OF FACT AND
CONCLUSIONS OF LAW
[Under Rule 52(a), F.R.C.P.]
C 71-72

The trial of the above-entitled matter began before the Honorable Aldon J. Anderson, United States District Judge, on October 27, 1976. Edward W. Clyde, James L. Wadsworth, and D. Martin Cook appeared as counsel for the plaintiff. Robert Wyshak and Lillian Wyshak appeared as counsel for defendant John H. Meier, and C. Jeffrey Thompson appeared as counsel for defendant John R. Suckling. After the witnesses were sworn and testified, the exhibits received, and the presentation of evidence closed, arguments were continued to April 23, 1977, to allow for the hearing of a claim of fraud upon the court in connection with certain exhibits proffered during the trial of the case in chief. Time was allowed for the making of a transcript of the testimony to assist in this effort. The hearing of the claim of fraud was held and counsel made their arguments in the case at hand on April 23, 1977, and filed their post trial briefs on May 9, 1977. The court made its ruling on the claim of fraud on the 11th day of October, 1977, and having considered the effect of that ruling upon the case, and deeming itself fully advised is prepared to enter its ruling.

Briefly, in the case in chief, the plaintiff seeks an accounting, claiming the defendant Meier, its trusted agent, breached that trust in handling the acquisition of certain mining claims, and diverted funds to his own use and that of others. Defendant denies the breach and claims a settlement agreement that he wants enforced.

In the course of moving the case to trial extensive domestic and foreign discovery has been had, and lengthy pretrial proceedings. Numerous motions have been filed, briefed, argued and ruled upon. An early attack was made upon the jurisdiction of the court over the defendants under the Utah long-arm statute. After hearing and argument

the court denied the motion. An interlocutory appeal was taken to the Court of Appeals of the Tenth Circuit where the ruling of the trial court was affirmed. A stay of discovery was allowed because of the serious illness of the defendant Hatsis. A further delay was granted to enable the completion of the criminal prosecution of the defendant Meier under an indictment filed in Nevada for alleged tax fraud in connection with failure to report monies involved in the transactions under consideration in this case. This stay was terminated after Mr. Meier failed to appear for prosecution of the matter and his bail was forfeited. Time was given the parties to pursue a settlement effort that had been attempted, but without success. Defendant Meier filed a motion to stay proceedings on the theory that they were in the nature of criminal proceedings, and that in view of Meier's constitutional right to claim the Fifth Amendment as to all inquiries with respect to the matters at hand, and his absence from the United States, the trial could not proceed until the criminal prosecution was concluded. This was denied. An effort was made to appeal this to the Circuit Court by a Petition for Mandamus and then, it is understood, to the United States Supreme Court, but without success for defendant. The matter was further delayed to allow the defendent Suckling to seek clarification from the United States District Court for the Central District of California as to whether or not he was under the ban of its order enjoining him from testifying because of attorney-client privilege governing his relationship with Mr. Meier. This was resolved by a dismissal of the California case in which the order had been entered. This court determined that the presumptive facts about which he had conversations with Mr. Meier made out a prima facie case of conspiracy to commit a fraud or crime, and that under such circumstances, though Mr. Suckling may not have been aware of this at the time, the conversations with Mr. Meier would not be privileged. He was ordered to testify with respect to the same.

The defendant Meier filed a petition seeking enforcement of a claimed settlement agreement. Numerous motions were filed and argued on this matter. As a result an issue on the same appears in the pretrial order, and a non-jury trial of the claim of settlement was held October 20, 1976, and continuing to October 27, 1976. The court made its ruling denying enforcement of the claimed settlement agreement, stating its findings, and conclusions and order into the record. Immediately thereafter the trial of the case in chief took up, as above noted, on October 27, 1976.

By the time of trial settlements resulting in dismissals and defaults based upon service and failure to answer were accomplished as to all of the defendants, except John H. Meier and John R. Suckling. During trial, after he testified, counsel advised the court that the plaintiff and Suckling had reached a settlement of their differences and the case was dismissed as to him.

The hearing on the claim of fraud upon the court involved the resolution of a motion by plaintiff and defendent Meier, upon agreement with the court, to determine whether a fraud had been perpetrated upon the court in the filing of certain documents by the parties in the case in chief. The plaintiff asked that this determination be made with respect to

Exhibits A and B attached to defendant Meier's motion dated November 10, 1976, and filed with the court on or about said date near the conclusion of the evidence of the case in chief. It asked for a change in the pretrial order and a continuance of the trial upon the affidavit of Mr. Wyshak that he hoped to show that the two affidavits of Mr. Hughes, filed in this case, assuring the court of his availability for deposition at the court's order, were forgeries. Exhibits A and B were filed by Mr. Wyshak in support of the motion. The defendant asked for the hearing to have the court determine upon the basis of evidence which his counsel thought was available in the form of exhibits and expert testimony to show that Mr. Hughes had not signed the affidavits referred to. A difficult trial of this matter ensued, with a number of witnesses, many exhibits and highly technical expert testimony. As observed above, a written opinion has been filed in that matter, as a result of which the court determined that the burden to establish the forgery of the Hughes affidavits had not been met. Consequently, they stand in the file for what they purport to be.

## Jurisdiction and Venue

Jurisdiction was invoked under Title 28, United States Code, Sec. 1332. Plaintiff is and at the time the complaint was filed was a corporation incorporated under the laws of the State of Delaware, and had its principal place of business in the State of Texas. At the time the complaint was filed, defendant John H. Meier was a citizen of the State of New Mexico, and he was residing in Vancouver, British Columbia, Canada. Plaintiff proved more than $10,000 was in controversy. The court finds jurisdiction established.

Process was served on the defendants Meier and Suckling under Utah's long arm statute, U.C.A. Sec. 78-27-22, et seq., (Supp. 1971). A motion to quash service and to dismiss was made by each of the said defendants, and denied by this court. That ruling was affirmed by the United States Court of Appeals (Tenth Circuit), in *Hughes Tool Co. v. John H. Meier, et al.*, 486 F.2d 593 (1973). Meier has argued this matter again in his post trial materials, but the ruling stands.

Defendant Meier contends there have been insufficient contacts with the State of Utah to subject him to *in personam* jurisdiction, and the court will deal with this question hereafter as an issue of law and an issue of fact.

Anthony G. Hatsis, Toledo Mining Company, Globe, Incorporated, and Charles W. Adams were named as defendants, but the action has been settled and dismissed as to them. Malaga Investments, Limited was never served. The rest of the named defendants have been served, but have defaulted. However, no default judgments have been entered against said other named defendants.

## Plaintiff's Contentions

(a) That John H. Meier was plaintiff's agent in the acquisition for the plaintiff of mining properties in the State of Nevada; that defendant

Meier abandoned his fiduciary duty to the plaintiff and, together with others, sold the mining claims to the plaintiff at increased prices and secretly participated in the redistribution of the money to and for the benefit of defendant Meier and others.

That plaintiff contends as a matter of law defendant Meier had a fiduciary duty to acquire the mining properties for the plaintiff at the lowest available price, and that as a matter of law he breached his fiduciary duty in permitting the properties to be acquired from the long time owners thereof, in the names of strawmen sellers and in permitting the strawmen sellers to sell the same to the plaintiff at greatly inflated prices. Plaintiff contends that defendant Meier had a duty to account to the plaintiff for all of the monies paid for said properties by the plaintiff, except the real purchase price thereof, and the costs of the escrow and sale, and plaintiff, as a matter of law, will be entitled to a money judgment against defendant Meier for all such funds for which he does not properly account.

(b) That there were five mining claim sales transactions, which were consummated with plaintiff through defendant Meier, in Utah escrows, as follows:

(i) A sale on or about the 24th day of June, 1969, by Anthony G. Hatsis to plaintiff. The purchase price was $850,000, and the escrow agent was Continental Bank & Trust Co. of Salt Lake City, Utah.

(ii) A sale on or about the 15th day of May, 1969, wherein a corporation named CPLD Company was the named purchaser, and Anthony Bogdanich was the named seller. The purchase price was $2,900,000. The actual buyer was the plaintiff, and the $2,900,000 was paid into the escrow by the plaintiff, and in its name.

(iii) A sale on or about September 4, 1969, wherein Leon Belaustegui was named as the seller and plaintiff was named as the buyer. The sale price was $1,500,000.

(iv) A sale on or about October 20, 1969, wherein Leon Belaustegui and Sam Bida were named as sellers, and plaintiff was the buyer. The purchase price was $1,900,000.

(v) A sale on or about December 2, 1969, wherein Globe Minerals, Inc. was named as seller and plaintiff was named as buyer. The purchase price was $1,400,000.

(c) That except as to the properties wherein Anthony Bogdanich was the named seller, the mining properties sold under the above identified transactions were acquired by the named strawmen sellers simultaneously with or shortly before the sale of said properties to the plaintiff; that the price at which the properties were optioned to the named sellers by the previous or long-time owners was a relatively low price. The price was then increased, and the properties were sold to the plaintiff through defendant Meier. The named sellers in the above-identified sales to the plaintiff received a fixed and pre-agreed fee for a small portion of the sales price, and the remainder of the proceeds were redistributed by

various means to or for the use and benefit of defendant Meier and others.

(d) Specifically, plaintiff contends that $4,816,976.02 was wrongfully redistributed for the use and benefit of defendant Meier and others, and that of this amount ($900,000 was paid to John R. Suckling as attorney for defendant Meier, and the balance was delivered to E. B. VanWalsum and Maatschappij Intermovie and deposited in the Netherlands, in the account of Intermovie. Other sums, in addition to the $4,816,976.02, were diverted from the named sellers, and redistributed to defendant Hatsis, who was acting in concert with defendant Meier. Still other sums were wrongfully paid to strawmen sellers for acting in that capacity.

(e) Plaintiff further contends that defendant John R. Suckling, E. B. VanWalsum, defendant Inrespro, Ltd., defendant Maatschappij Intermovie, defendant Charles W. Adams, Din Van Ruller, the managing director of Maatschappij Intermovie, and Tony In der Reiden, the manager of Inrespro, Ltd., were all working as agents or representatives of defendant John H. Meier, and that the $4,816,976.02 was turned over to said individuals and firms for the use and benefit of defendants Meier and Hatsis, and that the defendant Meier should be ordered to account for all of said money.

(f) That in addition to the money diverted to John R. Suckling, E. B. VanWalsum and Intermovie, as aforesaid, large sums of money were diverted from the strawmen, or named sellers in each of the above transactions, and paid to the defendant Hatsis, who was acting in concert with the defendant Meier, and that defendant Meier should also be required to account for all sums of money redistributed to the defendant Hatsis and others, in addition to the $4,816,976.02 referred to above, including all sums paid to the strawmen sellers.

### Defendant Meier's Contentions

Defendant Meier made a general denial of the allegations of the complaint, and denied any fiduciary relationship, any act of wrongdoing, or any breach of fiduciary duty, and put the plaintiff to plaintiff's proof on each element of plaintiff's case.

The court affirmed its preclusion order of October 19, 1976. Under it defendant Meier was precluded from calling or examining witnesses or offering exhibits, except as the same related to the jurisdictional facts and to his general denial. The court heard at length his claim to enforce a purported settlement agreement.

Defendant Meier refused to produce any documents, refused to make any admissions in response to requests by the plaintiff, and refused to answer questions asked on oral deposition, all on constitutional grounds, claiming the Fifth Amendment.

The court concludes, on the basis of the evidence and for the reasons set forth more fully and explicitly hereinafter, that the plaintiff is entitled to an equitable accounting from the defendant Meier, and that judgment, at the appropriate time, should be entered requiring the defendant Meier to make restitution of any secret profits or benefits he

realized in connection with the sale to the plaintiff of the mining claims and the subsequent diversion of the money for purposes other than to serve the interests of the principal.

### Personal Jurisdiction

Before reaching the merits, the court must consider defendant Meier's argument that he had insufficient contacts with the State of Utah to authorize this court, consistent with due process of law, to exercise jurisdiction over his person under the Utah long arm statute, based on notions of fair play and substantial justice.

The United States Supreme Court first enunciated the governing test for personal jurisdiction over non-residents under state long arm statutes in *International Shoe Co. v. Washington,* 326 U.S. 310 (1945):

[D]ue process requires only that in order to subject a defendant to a judgment *in personam,* if he be not present within the territory of the forum, he have certain minimum contacts with it such that the maintenance of the suit does not offend "traditional notions of fair play and substantial justice."

*Id.* at 316. Most recently, the Court has analyzed the development of the minimum contacts standard for personal jurisdiction and the subsequent extension of the minimum contacts standard to *in rem* jurisdiction. *See Shaffer v. Heitner,* 45 U.S.L.W. 4849, 4852-56 (U.S. June 24, 1977). The analysis of the minimum contacts standard in *Shaffer* as applied to personal jurisdiction in *International Shoe* focused on whether

"such contacts of the corporation with the state of the forum as make it *reasonable,* in the context of our federal system of government, to require the corporation to defend the particular suit which is brought there."

*Id.* at 4854, *quoting* 326 U.S. at 317. The court concludes that "reasonableness" depends on a qualitative, rather than a quantitative, analysis of "the relationship among the defendant, the forum, and the litigation." *Id.*

This court has also extensively analyzed the implications of the application of the *International Shoe* minimum contacts standard to personal jurisdiction over non-resident defendants under the state long arm statute. In *Engineered Sports Product v. Brunswick Corp.,* 362 F. Supp. 722 (D. Utah 1973), the court stated that

[t]raditional notions of fair play and substantial justice require a qualitative analysis of each defendant's contacts with the forum in order to ensure fairness and reasonableness to the defendants and territorial respect for sister states.

*Id.* at 726. See also *Mountain States Sports, Inc. v. Sharman,* 353 F. Supp. 613, 615-16 (D. Utah 1972).

The plaintiff contends, and the record supports, that the defendant Meier, or agents acting at his direction and for his benefit, was a key party in a conspiracy implemented in Utah, and had numerous contacts with the State of Utah in connection with the mining claims transactions in issue, even though the claims themselves were located in the State of Nevada. Clearly there was the transaction of business in Utah and the causing of injury by tortious conduct in the jurisdiction. As provided in 78-27-24, UTAH CODE ANN., 1973, these are events by which a person submits himself to the jurisdiction of the court. In relation to the five sales transactions at issue, which will each be discussed more fully hereinafter, the court makes the following general observations as an overview to personal jurisdiction over the defendant Meier. The defendant Meier or his agents acting at his direction and for his benefit entered the State of Utah on several occasions to negotiate and close Utah escrows on the five transactions. The named sellers in the transactions were either Utah residents or came into the state to negotiate and consummate the agreements. The escrow funds were delivered to a Salt Lake attorney, James P. Cowley, for distribution through agents or intermediaries who acted at Meier's request and for his benefit to divert the money overseas. These agents or intermediaries received the distributions from the escrow funds in Salt Lake City. In light of these general findings on the background to the transactions, the court believes that Meier would have a reasonable basis for knowing that these transactions would have a foreseeable effect upon his amenability to suit in a jurisdiction where substantial sums of money were expended and escrow accounts were opened and closed in the state. The court, after having made these general observations on the effect of the transactions in the State of Utah, will now turn to the specific events that compel the conclusion that defendant Meier had sufficient contact with this State to make it reasonable for the court to exercise jurisdiciton over his person.

The specific significant contacts of the defendant Meier or his agents in each of the five transactions are as follows:

1. *The Bogdanich Sale - $2,900,00.*

The Memorandum of Agreement, dated May 15, 1969, was made and entered into in Salt Lake City, Utah (Ex. 5 - R 446-450) by and between Anthony Bogdanich of Salt Lake City, Utah, as the named seller and CPLD Company, a Nevada corporation, as the named buyer. Joseph M. Foley testified that he was sent to Salt Lake City by John Meier to handle the Bogdanich sale and was present when the agreement was signed by Bogdanich. (R 804, 805.) During the course of arranging the transaction, the problem developed that CPLD, which lacked funds, needed a $5,000 down payment for the sale. Foley called Meier on the phone from Salt Lake City and explained the problem to Meier. Hatsis then said he would advance the $5,000. Mr. Hatsis took the phone and discussed it with Meier and it was "effected." Foley signed the documents in behalf of CPLD. (Exhibit 5, the agreement of sale and Exhibit 6, the escrow agreement.) Foley further testified the 2.9 million for the sale came from Hughes Tool Company through CPLD. Exhibit

103 was received which shows Meier made a request of Hughes Tool Company for payment of the 2.9 million through CPLD. (R 806-808.) Hatsis with defendant Meier's approval on the telephone advanced the $5,000 for the transaction. (R 804, 805.) In following the seller's escrow instructions, attorney James P. Cowley, the Salt Lake City escrow holder, distributed the funds, including a $900,000 cashier's check (Ex. 11) payable to John Suckling that Cowley delivered to Hatsis in Salt Lake City. (R 462.) Although direct testimony is not available due to the assertion of the constitutional privilege, presumably Hatsis delivered the $900,000 cashier's check to Meier since Meier personally delivered the check (Ex. 75) to Suckling in Las Vegas, Nevada. (R 1500.) The evidence that will be discussed hereinafter in relation to the merits clearly establishes defendant Meier's involvement in arranging the Bogdanich transaction through CPLD Company.

### 2. *The Hatsis Sale - $850,000.*

The memorandum agreement entered into at Salt Lake City, Utah on June 20, 1969, named Anthony G. Hatsis, a Utah resident (R. 638), as seller and the plaintiff as buyer. The agreement was signed "Buyer, Hughes Tool Company, by John H. Meier, Hughes Nevada Operations." (Ex. 58.) The transaction was closed through a Utah escrow holder, Continental Bank & Trust Company (Ex. 60), on the basis of an escrow agreement signed by the plaintiff "by John H. Meier, Hughes Nevada Operations." (Ex. 63.) Meier, by letter dated August 7, 1969, still representing himself as acting for Hughes Tool Company, directed the bank to withhold certain funds until a title problem was cleared, and to otherwise distribute the funds. On August 11, 1969, the bank closed the escrow, and after payment of legal and escrow fees a disbursement was paid to Hatsis of $750,915.06. (Ex. 61 - R 546.) The accounting of the bank as escrow shows it received $850,000 from the Hughes Tool Company, the sales price to Hatsis. (Intermovie was paid $480,000 from this transaction.) (R 964-6, 997 and 1402.) The evidence establishes that the defendant Meier actively participated in the Hatsis sale, which included numerous Utah contacts of which Meier was aware.

### 3. *The Belaustegui Sale - $1,500,000.*

An escrow agreement dated Spetember 4, 1969, named Belaustegui, a Nevada resident, as the seller, the plaintiff as the buyer, and Continental Bank of Salt Lake City, Utah, as the escrow agent. The escrow agreement was signed for the plaintiff "by John H. Meier, Hughes Nevada Operations." (Ex. 18 - R 473, 493.) All the documents relating to the Belaustegui transaction were executed by Belaustegui in Cowley's Salt Lake City offices. (R 480.) Cowley distributed the escrow funds, including $900,000 that went to VanWalsum (Exs. 23, 29) whose connections with the transfer of funds overseas will be explained more fully hereinafter. At his request, $50,000 of the $950,000 was to be paid to Hatsis. (Ex. 23.) His address is shown on the escrow agreement as in care of James P. Cowley, Salt Lake City, Utah. He came to Salt Lake City in connection with this sale three or four times. (R 481.) The bank accounting (Ex. 21) shows the escrow received from plaintiff $1,500,000.

The net released to seller was $1,497,262.34. It was turned over to Cowley. He issued checks on this amount. One for $900,000 went to VanWalsum (Exs. 23 and 29). The deeds were notarized and executed in the offices of Cowley. Cowley said he was looking after the interest of Belaustegui, (R 503), though not hired by him. Belaustegui said he had not hired Cowley as his attorney, and that he was Hatsis' attorney (R 691). Cowley acted as attorney for Hatsis although Hatsis was not named a party to the sales transaction. (R 503.)

4. *The Bida and Belaustegui Sale - $1,900,000.*

An escrow agreement dated October 20, 1969, (Ex. 33 - R 502) named Bida and Belaustegui as sellers, the plaintiff as buyer, and Continental Bank of Salt Lake City as the escrow agent. The agreement was signed for the plaintiff "by John H. Meier, Hughes Nevada Operations." (Ex. 33.) Bida and Belaustegui came to Salt Lake City for the purpose of signing the agreement in Cowley's offices (R 502), where the deeds were in fact signed and notarized (Exs. 83 and 84 - R 645, 646). The bank's accounting (Ex. 36 - R 508-510) establishes, and the court so finds, that the plaintiff deposited the agreed amount of 1.9 million. The net amount accounted for and paid to the named sellers was $1,880,843.50. (R 508-510.) The named sellers, in turn, delivered the total net amount to Cowley (R 509) who redistributed the funds according to the written instructions of Bida, Belaustegui, VanWalsum and Hatsis (Ex. 43 - R 511). Cowley made checks to Hatsis for $22,270 to repay funds advanced for exercising an option to support the transaction. Further checks for $512,730 and $30,843.50 were given Hatsis. Bida and Belaustegui received a check for $165,000 (R 513-515). VanWalsum received $1,150,000 in accordance with the instructions. (Exs. 43, 73, 74 - R 591, 592.) The role of VanWalsum in acting for the ultimate benefit of Meier to transfer the funds overseas will be detailed hereinafter. VanWalsum directed Cowley to deliver the $1,150,000 to Hatsis. (R 518.) Julia Feist, a Los Angeles attorney, came to Salt Lake City to pick up the $1,150,000 which she delivered to John Suckling (R 1404, 1405).

5. *Globe Minerals, Inc. Sale.*

This transaction is reflected in an escrow agreement dated December 2, 1969, naming Globe Minerals, Inc. as the seller, plaintiff as buyer, and Continental Bank of Salt Lake City as escrow agent. (Ex. 46.) The escrow was signed in behalf of Globe by Al T. Hays, who resided in Salt Lake City (R 578). The banks accounting showed it received $1,400,000 from plaintiff; that the transaction closed. (Ex. 54.) After discussing with Meier various disbursements, Mr. Suckling sent checks for $57,000 payable to Jackson Mining Company (R 531-534, 1315, 1558); two checks totaling $110,000 to Globe (Ex. 98 - R 534, 1315, 1562-3), and a check to Bida and Belaustegui for $38,000 (Ex. 52 - R 1562). These checks were sent by letter to Cowley by Suckling (R 529, 739). He gave the $57,000 check to VanCott, Bagley law firm for Jackson to clear the titles. The named seller received $1,386,976.02 after the close of escrow and gave it to Cowley (R 532, 535). Cowley purchased a cashier's check in that amount and delivered it to VanWalsum in Salt Lake City (R 537, 538).

While a more detailed analysis of VanWalsum's role is made hereinafter, at this point it is sufficient to state that VanWalsum was acting in the State of Utah to transfer the money overseas for the benefit of Meier and Hatsis (R 1275, 1287, 1702).

In addition to these transactions conducted either from outside the State of Utah (e.g., signing the escrow agreements in the Hatsis or Belaustegui sales) or through agents coming into the State of Utah, the defendant Meier had come into the State of Utah for purposes of transacting business or aiding in the ongoing negotiations and transfer of monies overseas. Defendant Meier had been to Salt Lake City in February (Ex. 109 - R 816) and March (Ex. 108 - R 815) during the period of the negotiations, particularly for the earlier transactions: the Bogdanich and Hatsis sales. When asked of the purpose for his visits during his deposition, the defendant Meier asserted his constitutional privilege not to answer.

The United States Supreme Court recently stated "the prevailing rule" in *Baxter v. Palmigiano*, 425 U.S. 308 (1976), that "the Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them: the Amendment 'does not preclude the inference where the privilege is claimed by *a party to a civil cause.*' " *Id.* at 318, *quoting* 8 *J. Wigmore, Evidence* 439 (McNaughton rev. 1961) (emphasis in original). *Cf. United States v. Parness*, 503 F.2d 430, 437 (2d Cir. 1974), *cert. denied*, 419 U.S. 1105 (1975). In light of the prevailing rule, the court finds that the plaintiff has produced credible evidence of the personal presence of the defendant Meier in the State of Utah contemporaneously with the transactions in issue, particularly the Bogdanich and Hatsis sales. The court, therefore, draws the adverse inference, in light of defendant Meier's refusal to produce evidence or testify to the contrary in this civil action, that the defendant Meier was personally in the State of Utah to transact business relating to the acquisition of the mining claims.

In addition, John Rix, the comptroller for Toledo Mining Company, testified that he met defendant Meier "[t]wo or three times" in the Toledo offices in 1969 during the time when "Toledo was negotiating the sale of some mining leases to the Hughes Tool Company." (R 1378.) According to the testimony of VanWalsum, the defendant Meier came to Utah on or about February 1, 1970, in a private plane to pick up Hatsis for a trip to the Netherlands Antilles to have a conference with In der Rieden in Curacao about their matters of mutual interest. (R 1285, 1286.)

The foregoing facts clearly establish that the defendant Meier had sufficient minimum contacts with the State of Utah to make it reasonable for the defendant to defend this action in Utah. The defendant had extensive dealings in the State of Utah through those acting on his behalf. Some of those are Utah residents and were co-defendants. He signed the escrow agreements on behalf of the plaintiff fully aware that his dealings were oriented toward Utah and would involve the consummation of agreements with purported Utah sellers and the closing of escrows with Utah escrow agents. The defendant Meier had taken full

advantage of using the facilities and banking institutions of the state to transact his business in this state. The notions of fair play and substantial justice are not offended by requiring the defendant to defend this action in the forum where a significant portion of his business activities in relation to the controversial mining claims took place, and where the basic actions of conspiratorial fraud took place. The court, therefore, concludes as a matter of law that the court has in personam jurisdiction over the defendant under the Utah long arm statute.

## Equitable Action for Accounting

With respect to the claim for accounting, the plaintiff contends that the defendant Meier was a trusted agent of the plaintiff; that in that capacity he had certain fiduciary obligations toward the plaintiff; that by receiving monies from the inflated sales of mining claims through strawmen sellers the defendant Meier breached that duty; and that the defendant Meier must now account for the amounts, if any, he received in breach of his fiduciary obligation and must also account for all money that came into his possession so that the plaintiff can ascertain the amount which was not devoted to furthering the plaintiff's best interests as the defendant Meier was charged to do. If an accounting is ordered by this court, the plaintiff seeks a judgment for restitution of that amount wrongly diverted or otherwise disposed of from the sales to the defendant Meier's benefit.

The defendant has entered a general denial and asserted a defense of settlement which he sought to have enforced. The latter was ruled upon by the court, adversely to the defendant Meier. Meier has at times alluded to the fact that Mr. Hughes approved of his having any money he received. However, he did not file a motion to so amend his complaint over the years of the prosecution of this case. As late as September 8, 1976, at the pretrial hearing with the court, Mr. Wyshak for the defendant Meier asserted that the proceeding was like a criminal proceeding and he did not have to show any exhibits or disclose any witnesses. (P.19 Transcript of Proceedings before the court on September 8, 1976.) On that date Mr. Clyde was complaining to the court that defendant had been informed of plaintiff's witnesses and exhibits, while defendant had not and still refused to advise whether he was admitting he had diverted the funds but had been given authority by Hughes to keep them, or whether he was standing on his general denial, which his earlier counsel, Mr. Gardiner, had clearly said was his position. Nor had the defendant plead or proposed any other defense or combination thereof, if such there be. At the conclusion of the pretrial hearing the court ordered the defendant's attorney to meet with plaintiff's attorney and work out the problems complained of, state their witnesses and exhibits, and have a pretrial order for the court. Mr. Wyshak made a motion to stay the case, claiming it was like a criminal case and because of defendant's assertion of the Fifth Amendment and his absence out of the country the case could not be tried until the criminal case was disposed of. He filed a supporting memorandum on September 21, 1976.

This court denied the motion. On October 15, 1976, he petitioned the Court of Appeals of the Tenth Circuit to mandamus this court to stay the trial. This was denied and the court is informed an effort to have the United States Supreme Court stay the matter was unsuccessful.

On October 19, 1976, the court denied defendant's motion to reconsider a request for further discovery, for jury trial and for stay of proceedings. The court also denied an oral request that the court recuse itself from the trial of the case on the merits.

Mr. Clyde on October 1, 1976, filed his motion for a preclusion order reciting the same complaints and further noting that two attorneys' conferences had been held with defense counsel still declining to disclose witnesses or exhibits he intended to offer. He noted Mr. Wyshak's statement at pretrial that he was going to treat the case as a criminal case and was not disposed to reveal witnesses and exhibits. On October 19, 1976, at the "final pretrial" with the court, the preclusion order was granted, for the reasons argued by plaintiff. When the pretrial order was finally signed, October 27, 1976, and left with the court (not stamped until November 10, 1976), the trial of the settlement phase of the case had been substantially completed. The pretrial order affirmed the preclusion order. The effect of that order was to preclude the defendant Meier from introducing "surprise" testimony and exhibits on the theory, sometimes advanced by the defendant, that Howard R. Hughes had approved the distribution of the funds to Meier. The defendant Meier was held to introduce only evidence that would support his claimed general denial and enforcement of the claimed settlement agreement.

In addition to the court's findings on the jurisdictional facts of the five contested transactions, the plaintiff established a maze of facts leading through the acquisition of the mining claims, the sales thereof to the plaintiff through strawmen sellers, the distribution of the sales proceeds through Cowley, the transfer of funds overseas through VanWalsum and others, and the eventual use of the funds for the benefit of the defendant Meier. Rather than trace the steps of each individual transaction, the court will summarize the steps that are common to each of the transactions. The plaintiff's burden is not, after all, to prove a chain of evidence for the monies allegedly taken by the defalcating agent. Rather, the plaintiff's burden is to prove that the defendant Meier had a fiduciary obligation to the plaintiff, that the defendant breached that obligation by receiving monies through the strawmen sellers that came from the plaintiff, in violation of his obligation to act fairly in the plaintiff's interest, and that the plaintiff has been injured by the defendant's acts.

The defendant contends that he owed no duty to the plaintiff because, in fact, he was employed by Robert A. Maheu & Associates. This position ignores the evidence of his agency for plaintiff and the fact that Meier signed the escrow agreements in the Hatsis, Belaustegui, and Belaustegui-Bida transactions and was extensively involved, as explained hereinabove, on behalf of the plaintiff. As previously noted, defendant Meier signed numerous documents on behalf of the plaintiff in negotiating and consummating these transactions. Among them, in the Hatsis

sale, Meier signed an affidavit entitled, "Affidavit of Realty Transferred" (Ex. 100 - R 786) and signed as the grantee's "agent," the grantee being the plaintiff herein, and verified the value of the realty transferred in the Hatsis transaction as $850,000. The defendant Meier signed the Request for Disbursement of the sales proceeds in the same amount from the plaintiff to the respective buyers in the Hatsis sale (Ex. 105 - R 812), the Belaustegui sale (Ex. 107 - R 812, 813), and the Bida & Belaustegui sale (Ex. 104 - R 811). The defendant Meier directly acknowledged his authority for plaintiff to acquire claims and negotiated with Joseph Foley to provide a shell corporation (CPLD) that would take title to the mining claims in the Bogdanich sale to avoid publicity that the plaintiff was acquiring the claims (R 800-01, 1098). Substantial evidence supports the court's finding that the defendant was self-dealing in violation of his fiduciary duty.

In addition to the facts already noted in the Bogdanich transaction, the defendant Meier personally authorized Foley to let Hatsis advance $5,000 (R 805) as the down payment in the Bodganich sale. In the Globe Minerals sale, the defendant Meier gave his attorney, John Suckling, authority to approve quite a number of disbursements requested by Van Walsum and which Meier had reviewed with Suckling. Meier also acknowledged to him that he knew the source of the funds was from the transactions for plaintiff in question (R 1562-1572).

The court finds that Meier knew of and helped arrange for the transfer of the major portion of the sales proceeds to overseas accounts, investments, and trusts through VanWalsum and Intermovie and other business entities. While the tax laws were such that the defendant Meier could not appear, directly or in-directly, as an owner of these funds, (see R 1411, 1414, 1430), the court finds that Meier undertook to retain practical control over these funds that were ultimately deposited into trust (R 1435-1505) or were placed in the control of other individuals including Gillerion (R 1016-19), the VanWalsum Management Company and in Inriego and Inrespro in the Netherlands Antilles. The fact of Meier's claim to share in the funds that went overseas, from the mining transactions in question, was established by Suckling, who heard Meier and Hatsis reach agreement on an additional payment to be made to Hatsis, with additional stock credits (R 1435-1442) and monies to be divided between Hatsis and Meier as further distributions took place.

The court finds the defendant Meier knew or was in a position to know, either personally or through agents acting at his direction and for his benefit, that the mining claims were purchased for relatively nominal consideration and sold to the plaintiff, with Meier acting as plaintiff's agent, at greatly inflated prices.

1. *The Hatsis Sale.*

Anthony Hatsis purchased these claims from Columbia Investment Corporation on June 17, 1969 (Ex. 59) for $25,000 and 30,000 shares of Globe Minerals stock (R 543-44). Three days later these claims were sold through the defendant Meier to the plaintiff by Hatsis for $850,000 (Ex. 58, 60).

### 2. *The Bogdanich Sale.*

The evidence establishes that most of the claims that eventually were sold through the defendant Meier to the plaintiff were originally sold by Bida and Belaustegui to Bogdanich for consideration of $3,000 per month for 33 months and 100,000 shares of Westland Minerals stock. (Ex. 88.) This consideration was never fully paid for the claims. (R 714-15.) These claims were then sold to the plaintiff, in the corporate shell of CPLD, via the defendant Meiers agent, with Bogdanich as seller, for $2,900,000. (Ex. 5.) Of that consideration, Bogdanich received $150,000. Cowley also disbursed $900,000 of that consideration by check payable to Meier's attorney, John Suckling (R 1708). Cowley gave it to Hatsis (R 471). The defendant Meier later gave the $900,000 check to Suckling. (R 1500.) $350,000 was paid to Hatsis out of this money to repay a loan of $30,000 to $35,000 gambling debts of Mr. Bogdanich, and for some stock he never received, although Hatsis was not a party to the transaction (R 1708-1711). The court finds that the defendant Meier knew of the vast disparity in the relatively nominal acquisition cost of the claims subsequently sold to the plaintiff for an exorbitant amount in the Bogdanich Sale.

### 3. *The Belaustegui Sale.*

Belaustegui acquired his interest in these mining claims for no consideration (R 676). Belaustegui then assigned his interest to an alleged venture of Hatsis, Belaustegui, and VanWalsum (R 679-80). The escrow agent at the closing of the sale from Belaustegui to the plaintiff gave Belaustegui $1,494,262.34 as the remaining sales proceeds from the transaction with the plaintiff (R 482, 483). Belaustegui then delivered that amount to Cowley (R 482, 483). Cowely then distributed those funds including $476,762.34 to Hatsis (R 485) and $900,000 to VanWalsum (Exs. 23, 29).

### 4. *Bida & Belaustegui Sale.*

The mining claims for this transaction were acquired from Sellas and Hollopeter for $22,270 and monthly lease payments totaling $2,730 for a total of $25,000 purchase price. Hatsis, rather than Bida and Belaustegui, advanced the $22,270 portion of the purchase price (R 512). Hatsis was then reimbursed for that amount from the sales proceeds (R 511-13). These claims were then sold to the plaintiff through the defendant Meier for $1,900,000. Bida and Belaustegui then returned the net amount of the sales proceeds to Cowley (R 509) who distributed the funds including $1,150,000 that was given to VanWalsum (R 511) for transfer overseas where it was placed for the ultimate practical benefit and use of the defendant Meier. Hatsis received checks of $512,730 and $30,843.50, and Bida and Belaustegui were paid $165,000, through Mr. Cowley.

### 5. *Globe Minerals, Inc. Sale.*

The mining claims for this sale were acquired for $57,000 from Jackson Mountain Mining Co. (Ex. 55). The purchase amount of $57,000 was delivered by Suckling out of the $900,000 he had received from Meier in the Bogdanich sale (R 529-531, 1315). These claims were then sold to the

plaintiff for $1,400,000. The net sales proceeds were delivered to Cowley from Al Hays of Globe (R 584). Cowley then distributed that amount by cashier's check to VanWalsum who was waiting in front of the Continental Bank to take the check (R 537, 538). From other evidence the reasonable inference is he transferred it overseas.

It appears that in the close of the escrows on the five transactions, which are described in detail herein, the named sellers, in all cases except the one where Hatsis was the named seller, received the money from the escrow holder, and gave full control over the funds to Cowley, attorney for Hatsis (R 503). The instructions to the escrow holder were given by the sellers, but they knew little of the reasons and did not really make the decision how it should be distributed, nor did the named sellers participate in the real negotiation of the sales. They got their agreed fees and left the remainder with Hatsis, VanWalsum and Cowley for distribution (Belaustegui R 656, 647, 667, 671, 689; Hayes R 582, 583; Bogdanich 1700, 1706; VanWalsum R 968). The details on the Hatsis sale are unknown because the two persons who signed the sale agreement took the Fifth Amendment. Cowley worked with plaintiff through Foley and did not tell him of the redistributions (R 555).

From the five sales referred to, a total of $4,816,976.02 was paid to Suckling, Intermovie or VanWalsum (R 1402, 1216) and was part of a tax and investment program for the use and benefit of Meier and Hatsis. (R 1220, 1173, 1198, 1199, 1200, 1207, 1208, 1255, 1434, 1296.) The record shows this total came from the following sources:

| | |
|---|---|
| Hatsis Sale | $480,000 (R 1402, 965 - Ex. 111, 112) |
| Bogdanich Sale | $900,000 (R 1402, 1500 - Ex. 75, 11) |
| Belaustegui Sale | $900,000 (R 1402, 965) |
| Bida-Belaustegui Sale | $1,150,000 (R 1404, 973, 577, 1405 - Exs. 73, 74) |
| Globe Mineral Sale | $1,386,976.02 (R 1406, 537 - Ex. 54) |
| | $4,816,976.02 |

The final step in the transactions was the transfer of the funds overseas for the defendant Meier's use and benefit and with his knowledge. The court will summarize the more salient facts since the record contains numerous details bearing on defendant Meier's knowledge of the diversion of the funds and that they were to be transferred for his financial gain. Out of the Bogdanich sale, the defendant Meier at least received the use and benefit of $900,000 which he gave personally to his attorney Suckling (R 1500). Suckling paid his (Meier's) attorney's fees and costs from the money (R 1388), $100,000 was paid to plaintiff's superintendent in charge of mining (Ex. 93 - R 1340), and $100,000 by check to Intermovie, and $312,000 was either given to VanWalsum or sent to the addressee, Mr. Jack Holmstrom of First Security Bank of Salt Lake City to buy 200,000 shares of stock from Bogdanich (R 1318-1320).

Hatsis told Meier at the settlement talk in Los Angeles in December, 1970, that he was entitled to share with Meier in the funds that went overseas from the mining transactions (R 1434). VanWalsum met with

Hatsis in Salt Lake City in July, 1969, to talk about possibilities of transferring money to Europe (R 1145). He talked to him at least ten times. Hatsis told him how it was to be divided (R 1181). VanWalsum said the "set up was to get the money out of the country, and make certain investments . . . the people we were doing that for, which is Mr. Meier and Mr. Hatsis." (R 1207, 1208.) Hatsis told VanWalsum how much money out of every transaction was to go overseas (R 1287). VanWalsum makes it clear the five were working for two clients, Mr. Meier and Mr. Hatsis in all this, and that "they were the final owners of the funds we were handling through the whole system." (R 1255.)

The demand by Hatsis, through his attorney Cowley, upon Suckling, Meier's attorney, for an accounting leaves little doubt he believed they had an understanding and that he was entitled to an accounting (R 557, 1428, 1429). A fortiori, plaintiff should be entitled to an accounting (R 1434-1445). They met and worked out a division at the Los Angeles airport that brought Hatsis $450,000 more through a complex sale of stock, etc., which would net Hatsis $450,000 in cash. They agreed on a 50-50 deal on future transactions (R 1443).

In February, 1970, defendant Meier came to Salt Lake City in a private plane to pick up Hatsis for a trip to Curacao to talk with In der Reiden about the overseas fund (R 1285, 1394-95). A trust arrangement, funded with $1,100,000 of the money from the mining transactions was established for the benefit of Meier and his family. (Exs. 117, 119 - R 1674.) Even though the trust corpus was to revert to the VanWalsum management company at the end of the ten-year term, VanWalsum testified that the money belonged to Meier (R 1022). Meier was told about the trusts by Suckling and approved the use of the family names (R 1507, 1508).

Meier claimed complete control over the overseas funds and that it was "my money," as VanWalsum (R 1179-80, 1019) and Suckling (R 1513-1514, 1674) testified. VanWalsum's testimony clearly shows the involvement of Meier in asserting control over the use of the money and his right to use the money as he saw fit. For example, in addition to the $900,000 that Suckling received from Meier and the trust arrangements that have been discussed previously, Meier directed a foreign company (Inriego) that had received some of the funds to transfer certain money from Anglo-American Pictures to Gillerion. Meier met with VanWalsum during the period that these transactions were taking place to arrange for the placement of the funds to insure that they would be for his use and benefit. Meier requested transfers of $25,000 and $16,000 from Anglo-American Pictures, to his personal numbered account (R 1212-15). Suckling's testimony essentially corroborates that of VanWalsum on these points concerning Meier's involvement with the overseas funds and their placement.

The investment tax plan required the use of a resident Dutch corporation, Intermovie, to minimize taxes in the Netherlands (R 1410, 1411, 1668, 1669) and so Meier could not have direct control or ownership of the funds. The money was moved to Curacao to minimize taxes in the Netherlands. Suckling testified Inrespro was the ultimate recipient of all

the mining money, and that Inrespro didn't have any funds other than that which came from Intermovie. (R 1414, 1427, 1520.)

It was the intention Meier would earn substantially more from the money than he would have netted otherwise (R 1569, 1670, 1671, 1673). Meier agreed to the plan. As noted above, however, he became impatient and made demands for payments and increased control.

Meier told Suckling of the source of the funds in January of 1970 and explained the suspect acquisition of wealth as a way Hughes had of rewarding good service, although Foley, the attorney for plaintiff, and Gray and Morgan, of plaintiff company, were not so advised, and the business procedures did not otherwise show any intention of such. In addition, because of rulings the court has made there is no issue on this claim.

In summary, the plaintiff has established that there were five transactions and a total of their sales prices equals $8,550,000 as received from plaintiff. Less escrow expenses and authorized payments, there was released for distribution from the escrows to Cowley, Hatsis, et al., the sum of $8,401,587.72; that there was $4,816,976.02 diverted from the five transactions to accounts overseas through VanWalsum, Suckling, and Intermovie as well as other overseas business entities, with Meier's knowledge and for his substantial benefit. The plaintiff now seeks to have the defendant Meier account to the plaintiff for these amounts and prays the court to retain jurisdiction to enter a final judgment for restitution following an accounting. The court is of the opinion, and so finds and concludes, that the defendant Meier occupied a trusted fiduciary position with the plaintiff for the acquisition of mining properties; that the defendant Meier breached that duty by secretly diverting funds from the five sales to his own use and benefit and to the damage of his principal; that there is no legal basis under which defendant Meier could have properly received for his own use and benefit any of such money; and that the defendant Meier must account for the funds entrusted to his care in relation to these transactions. The defendant Meier, therefore, has the burden of showing exactly how the funds entrusted to his care were expended and used and any credits to which he may be entitled. *See Rosenak v. Poller*, 290 F.2d 748, 750 (D.C. Cir. 1961); *Simper v. Scorup*, 1 P.2d 941, 945 (Utah 1931). The court will retain jurisdiciton to enter its final judgment of restitution upon receipt of the defendant Meier's accounting.

## CONCLUSIONS OF LAW AND ORDER

In view of the foregoing findings, the court concludes as a matter of law defendant Meier must, and he is herewith ordered, to render an accounting of the funds that were diverted by the defendants from the proceeds paid by plaintiff for the purchase of the mining properties in question. Said accounting shall be provided in thirty (30) days from the date of this order.

Because of the rulings of the court as set out above, the accounting herewith required of defendant Meier shall be without leave to claim

approval by plaintiff, or its agents, for his retention of the funds received, if such he now acknowledges.

DATED this 20 day of December, 1977.

I hereby attest and certify on 3/8/85 that the foregoing document is a full, true and correct copy of the original on file in my office, and in my legal custody

(S) <u>Aldon J. Anderson</u>
ALDON J. ANDERSON
*United States District Judge*

CLERK, U.S. DISTRICT COURT
    CENTRAL DISTRICT OF      [SEAL]
        CALIFORNIA
<u>ADELA BARBOSA</u> Deputy