T.C. Memo. 2001-130

UNITED STATES TAX COURT

JOSEPH A. AND CAROL DELVECCHIO, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 6533-94.                    Filed June 6, 2001.

        Petitioner H was the sole proprietor of a
business, A.  Ps, H and W, filed original joint returns
and, subsequently, amended tax returns for the tax
years 1987 and 1988.  R determined deficiencies and
additions to tax against Ps based on Ps' failure to
report on the original returns all gross income from A
and all capital gain from the sale of real property.
        1.  <u>Held</u>:  Each of Ps' amended returns is an
admission of a tax underpayment.
        2.  <u>Held</u>, <u>further</u>, P-H is liable under sec.
6653(b)(1)(A), I.R.C., for 1987 and sec. 6653(b)(1),
I.R.C., for 1988 for the addition to tax for fraud on
the portion of the underpayment attributable to the
failure to report all gross income from A.
        3.  <u>Held</u>, <u>further</u>, to the extent we have
determined there to be an underpayment of tax
attributable to fraud, the addition to tax under sec.
6653(b)(1)(B), I.R.C., shall apply for 1987.
        4.  <u>Held</u>, <u>further</u>, Ps are liable for the addition
to tax for substantial understatement under sec. 6661,
I.R.C., for 1987 and 1988.

Joseph A. DelVecchio and Carol DelVecchio, pro se.

Leonard T. Provenzale, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION


HALPERN, Judge:  By notice of deficiency dated January 20, 1994, respondent determined deficiencies in, and additions to, petitioners' 1987 and 1988 Federal income taxes as follows:

Joseph DelVecchio:

| | | Additions to Tax | | | |
|---|---|---|---|---|---|
| | | Sec. | Sec. | Sec. | Sec. |
| Year | Deficiency | 6653(b)(1)(A) | 6653(b)(1) | 6653(b)(1)(B) | 6661 |
| 1987 | $29,400 | $22,050 | -- | [1] | $7,350 |
| 1988 | 16,699 | -- | $12,524 | -- | 4,175 |

[1] 50% of the interest payable under sec. 6601.

Carol DelVecchio:

| | | Additions to Tax | | | |
|---|---|---|---|---|---|
| | | Sec. | Sec. | Sec. | Sec. |
| Year | Deficiency | 6653(a)(1)(A) | 6653(a)(1)(B) | 6653(a)(1) | 6661 |
| 1987 | $29,400 | $1,470 | [1] | -- | $7,350 |
| 1988 | 16,699 | -- | -- | $835 | 4,175 |

[1] 50% of the interest payable under sec. 6601.

Following the trial in this case, respondent moved to amend the answer to conform the pleadings to the proof, to take account of amended tax returns received into evidence (which show items of income in excess of respondent's previous adjustments).  We granted that motion and, as amended, the answer now avers deficiencies in, and additions to, petitioners' Federal income taxes for 1987 and 1988 as follows:

Joseph DelVecchio:

| | | Additions to Tax | | | |
|---|---|---|---|---|---|
| Year | Deficiency | Sec. 6653(b)(1)(A) | Sec. 6653(b)(1) | Sec. 6653(b)(1)(B) | Sec. 6661 |
| 1987 | $30,789 | $23,092 | -- | [1] | $7,697 |
| 1988 | 29,282 | -- | $21,961 | -- | 7,321 |

[1] 50% of the interest payable under sec. 6601.

Carol DelVecchio:

| | | Additions to Tax | | | |
|---|---|---|---|---|---|
| Year | Deficiency | Sec. 6653(a)(1)(A) | Sec. 6653(a)(1)(B) | Sec. 6653(a)(1) | Sec. 6661 |
| 1987 | $30,789 | $1,539 | [1] | -- | $7,697 |
| 1988 | 29,282 | -- | -- | $1,464 | 7,321 |

[1] 50% of the interest payable under sec. 6601.

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

The principal issues remaining for decision are petitioners' claims that they are entitled to net operating loss deductions for the years in issue and the additions to tax.

FINDINGS OF FACT

Residence

Petitioners resided in Stuart, Florida, at the time the petition was filed.

Monterey Glass and Mirror Distributors

Petitioner Joseph DelVecchio (Joseph) is a glazier. During the years in issue, Joseph sold glass to both wholesale and retail customers. Joseph carried on his business as a

proprietorship, under the name "Monterey Glass and Mirror Distributors" (Monterey). Joseph (Monterey, when referring to the business) had a shop and employed two or three secretaries and two drivers.

Joseph was familiar with all aspects of Monterey's business. Deliveries to customers were made from Monterey's shop, and, when Monterey's drivers returned to the shop, Joseph reviewed all sale documents and received any checks collected by the drivers. Joseph opened Monterey's mail and removed any checks. He examined all invoices from vendors and the checks drawn to pay such invoices.

Bookkeeping

During the years in issue, a central feature of Monterey's system of bookkeeping was a financial register, referred to by the parties as the "peg board ledger system" (the peg board). The peg board consists of sheets of paper, on one side of which is a check register (the check register) and on the other side of which are columns to keep a running bank balance, showing checks drawn, deposits made, and the resulting balance. The check register consists of numerous columns. The first 5 columns have preprinted headings, as follows: "REMARKS", "PAID TO", "DATE", "CHECK NO.", and "AMOUNT OF CHECK". Blank checks overlay the first 5 columns, and, as the check is written, carbon is deposited onto a line of the ledger and records the information

for columns 2 through 5.  Columns 6 through 23 have no preprinted headings.  The headings may be filled in, or "extended", to identify information entered in the underlying column with respect to any check.

Generally, during the years in issue, checks to pay Monterey's expenses were written by secretaries.  All checks were recorded in the check register.  Joseph signed those checks.  As the checks were written, entries were automatically made in columns 2 through 5.  Columns 6 through 23 (and the headings of those columns) of the original pegboard remained blank until 1990, at which time, after the commencement of respondent's examination of the years in question, Joseph filled in the headings to identify various categories of expenses, e.g., insurance, phone, and truck repairs, and made entries in the appropriate column based on the check information on each line. At that time, entries were made footing each column.

During the years in issue, secretaries made entries on the reverse side of each sheet, to show checks written, deposits made, and the resulting bank balance.  Secretaries would collect checks received by Monterey, total them, enter the total as a deposit in the peg board, and deposit the checks in the bank. Joseph reviewed all invoices to customers and checks received.

Monterey also kept vendor ledger cards, files of sales invoices, and bank statements.

Joseph was familiar with the peg board and other aspects of Monterey's bookkeeping system.

## Sales and Bank Deposits

Generally, Monterey received payments for glass by check. Information as to all receipts was entered on the peg board, and the receipts were deposited into Monterey's account at First National Bank and Trust Company (the Monterey account). Monterey deposited $994,058.25 and $926,963.35 into the Monterey account during 1987 and 1988, respectively.

## Withdrawals

Monthly, during 1987 and 1988, Joseph examined statements showing the balance of the Monterey bank account and withdrew funds in excess of the amount needed to operate the business. He deposited such excess funds, in the amounts of $111,200 and $74,880, during 1987 and 1988, respectively, into interest bearing accounts in his own name.

## Original Tax Returns

Petitioners timely filed Forms 1040, U.S. Individual Income Tax Return, for 1987 and 1988 (the Forms 1040). Attached to the Forms 1040 were Schedules C, Profit or (Loss) From Business or Profession, which relate to Monterey (the Schedules C). Joseph prepared the Forms 1040 (including the Schedules C). In preparing the Schedules C, as source documents, Joseph had available the peg board, vendor ledger cards, sales invoices, and

Monterey's bank statements. At least for 1988, Joseph used an adding machine to prepare adding machine tapes (the adding machine tapes) totaling various periodic expenses, such as expenses for repairs and telephone, which were deducted on the Schedule C for 1988. Entries on the adding machine tapes correspond to the totals of such expenditures on pages of the peg board. For example, on the Schedule C for 1988 there is a deduction for repairs in the amount of $3,991. There is an adding machine tape headed "repairs", with 17 items, totaling $3,991.28. Column 21 on the check register pages of the peg board is headed "utilities". The footed amounts for column 21 match, on an item by item basis, all of the items on the adding machine tape.

Examination and Investigation

In January 1990, respondent began an examination of the Forms 1040. In July 1990, that examination was terminated, so that respondent could commence a criminal investigation of Joseph (the criminal investigation) with respect to his income tax liability for 1987 and 1988. The criminal investigation resulted in charges and a trial, at which, on, August 5, 1997, Joseph was acquitted of all charges.

Administrative Summons

On January 25, 1991, in connection with the criminal investigation, Special Agent Richard McLaughlin served an

administrative summons (the administrative summons) on petitioners' accountant, Nancy Crowder, who, in response thereto, turned over various business and personal records of petitioners. The records included bank statements, invoices, canceled checks, and a cash disbursements ledger. Respondent has returned some, if not all, of the documents obtained pursuant to the administrative summons.

Amended Returns

On April 13 and 14, 1993, petitioners filed Forms 1040X, Amended U.S. Individual Income Tax Return, for 1987 and 1988, respectively (the Forms 1040X). The Forms 1040X were prepared by accountants retained by Joseph. On the Forms 1040X, petitioners reported increases in Schedule C net income of $80,214 and $54,778, for 1987 and 1988, respectively, a capital gain of $27,944 for 1988, net operating loss deductions of $74,749 and $85,000 for 1987 and 1988, respectively, and decreases in interest income of $747 and $288, for 1987 and 1988, respectively. Following is a comparison of various Schedule C entries, with respect to Monterey, from the Schedules C attached to the Forms 1040 and Forms 1040X (the amended Schedules C).

### 1987

|  | Form 1040 | Form 1040X |
|---|---|---|
| Income |  |  |
| Gross receipts or sales | $442,171 | $982,437 |
| Less: Returns and allowances | 4,530 | -- |
| Less: Cost of goods sold | 301,892 | 644,154 |
| Balance (gross income) | 135,749 | 338,283 |

Deductions

| | Form 1040 | Form 1040X |
|---|---|---|
| Advertising | $1,015 | -- |
| Bad debts | 3,150 | -- |
| Bank service charges | 240 | 226 |
| Car & truck expenses | 8,733 | 7,675 |
| Depreciation | -- | 17,669 |
| Insurance | 5,032 | 10,526 |
| Office expense | 3,758 | 3,284 |
| Repairs | 2,117 | 955 |
| Supplies | -- | 4,707 |
| Taxes | -- | 8,248 |
| Utilities and telephone | 3,674 | 6,866 |
| Wages | 92,761 | 92,761 |
| Trash pickup | -- | -- |
| Other expenses | 660 | 14,443 |
| Nonemployee compensation | -- | 76,100 |
| Total deductions | $121,140 | $243,460 |
| | | |
| Net profit | $14,609 | $94,823 |

## 1988

| | Form 1040 | Form 1040X |
|---|---|---|
| **Income** | | |
| Gross receipts or sales | $506,362 | $900,342 |
| Less: Returns and allowances | 8,137 | 18 |
| Less: Cost of goods sold | $356,363 | $638,202 |
| Balance (gross income) | $141,862 | $262,122 |
| | | |
| **Deductions** | | |
| Advertising | $1,957 | $506 |
| Bad debts | 2,217 | 0 |
| Bank service charges | 348 | 343 |
| Car & truck expenses | 9,451 | 3,455 |
| Depreciation | 0 | 10,410 |
| Insurance | 9,032 | 23,550 |
| Office expenses | 4,452 | 2,887 |
| Repairs | 3,991 | 0 |
| | | |
| Supplies | 0 | 4,854 |
| Taxes | 0 | 10,435 |
| Utilities and telephone | 4,724 | 7,020 |
| Wages | 90,226 | 90,226 |
| Trash pickup | 0 | 0 |
| Other expenses | 848 | 39,042 |
| Nonemployee compensation | 0 | 0 |
| Total deductions | $127,246 | $192,728 |
| | | |
| Net profit | $14,616 | $69,394 |

Sales Tax Deficiencies

Monterey was subject to an examination by the State of Florida Department of Revenue (the Department) for sales tax liabilities for 1987, 1988, and other years. The Department found that Monterey had collected more sales taxes than reported to the Department. For 1987 and 1988, Monterey reported to the Department gross receipts of $288,276 and $124,763, respectively.

OPINION

I.  Deficiencies in Tax

Respondent determined deficiencies in petitioners' income taxes for 1987 and 1988 principally on account of respondent's determination that petitioners underreported their Schedule C income from Monterey by $75,859 and $44,347, for 1987 and 1988, respectively.[1] On the Forms 1040X, petitioners reported increased Schedule C net income for Monterey of $80,214 and $54,778, for 1987 and 1988, respectively, a capital gain of $27,944 for 1988, net operating loss deductions of $74,749 and $85,000 for 1987 and 1988, respectively, and decreases in interest income of $747 and $288, for 1987 and 1988,

_____

[1] Respondent also determined increased self-employment taxes under sec. 1401. Petitioners have not separately challenged those determinations, which, we assume, are derivative of respondent's principal adjustments. We do not further discuss the self-employment tax adjustments.

respectively. Respondent accepts the foregoing changes reported on the Forms 1040X except for the net operating loss deductions. Based on the Forms 1040X, we find that petitioners underreported their Schedule C net income from Monterey by $80,214 and $54,778, for 1987 and 1988, respectively, and failed to report a capital gain of $27,944 for 1988. Based on respondent's acceptance of the decreases in interest income shown on the Forms 1040X, we find that petitioners over reported their interest income in such amounts. Petitioners have failed to prove their entitlement to the net operating loss deductions claimed on the Forms 1040X, and we allow no deductions therefor.

II. Additions to Tax for Fraud

A. Introduction

Respondent has determined additions to tax for fraud against Joseph for both 1987 and 1988. For 1987, section 6653(b)(1)(A) imposes an addition to tax equal to 75 percent of any underpayment in tax if any part of the underpayment is due to fraud; section 6653(b)(1)(B) imposes a separate addition to tax, equal to 50 percent of the interest payable under section 6601, determined on the portion of the underpayment attributable to fraud. For 1988, section 6653(b)(1) imposes an addition to tax equal to 75 percent of any underpayment in tax if any part of the underpayment is due to fraud; the time-sensitive interest addition previously found in section 6653(b)(1)(B) is eliminated.

For both years, if the Secretary establishes that any portion of an underpayment is attributable to fraud, the entire underpayment is attributable to fraud, except with respect to any portion of the underpayment that the taxpayer establishes is not attributable to fraud. See sec. 6653(b)(2). Respondent has the burden of proving fraud by clear and convincing evidence. Sec. 7454(a); Rule 142(b). To prove that a taxpayer fraudulently underpaid a dollar of tax, respondent must prove both the fact of the underpayment and fraudulent intent with respect thereto. See, e.g., Recklitis v. Commissioner, 91 T.C. 874, 909 (1988).

B. Existence of an Underpayment

The first inquiry is whether any underpayment exists. As relevant to this case, section 6653(c)(1) defines an "underpayment" for purposes of section 6653 as a "deficiency" defined under section 6211. Petitioners filed amended returns for 1987 and 1988, the Forms 1040X, showing additional taxes due. Each of petitioners' amended returns is an admission of a tax underpayment. See Badaracco v. Commissioner, 464 U.S. 386, 399 (1984). Respondent has satisfied the first prong of the test.

C. Fraudulent Intent

1. Introduction

The second inquiry concerns the taxpayer's state of mind. The existence of a fraudulent state of mind is a question

of fact to be determined from the entire record. See <u>Recklitis v. Commissioner</u>, <u>supra</u> at 909; <u>Meier v. Commissioner</u>, 91 T.C. 273, 297 (1988). Respondent must show that petitioner intended to evade taxes known to be owing by conduct intended to conceal, mislead, or otherwise prevent the collection of taxes. <u>Stoltzfus v. United States</u>, 398 F.2d 1002, 1004 (3d Cir. 1968); <u>Parks v. Commissioner</u>, 94 T.C. 654, 660-661 (1990). Fraud will never be presumed, <u>Beaver v. Commissioner</u>, 55 T.C. 85, 92 (1970), but may, however, be proved by circumstantial evidence because direct proof of the taxpayer's intent is rarely available. <u>Recklitis v. Commissioner</u>, <u>supra</u> at 910; <u>Meier v. Commissioner</u>, <u>supra</u>. The taxpayer's entire course of conduct may be examined to establish the requisite fraudulent intent. <u>Recklitis v. Commissioner</u>, <u>supra</u>; <u>Meier v. Commissioner</u>, <u>supra</u>.

Having considered all of the evidence before us, we conclude that respondent clearly and convincingly has shown fraud with respect to at least the underpayments in tax attributable to Monterey for both 1987 and 1988. We do so based on the following factors, which, together, convince us that Joseph had fraudulent intent with respect to his underreporting of income from Monterey.

### 2. Consistent and Substantial Understatements of Income

On the Forms 1040X, petitioners reported increased net profit from Monterey of $80,214 and $54,778 for 1987 and 1988, respectively. The amended Schedules C show that, originally, petitioners underreported Monterey's gross sales by $540,266 and $393,980 for 1987 and 1988, respectively. Those are large amounts compared to the amounts originally reported. A consistent pattern of underreporting large amounts of income is evidence of fraud. See Holland v. United States, 348 U.S. 121, 137 (1954). Two years of substantial understatement may support a finding of fraud. See Kelley v. Commissioner, T.C. Memo. 1991-324 (1991), affd. 988 F.2d 1218 (11th Cir. 1993).

### 3. Control of Books and Records

Joseph prepared the Schedules C, on which Monterey's income was understated. Monterey's system of bookkeeping centered around the peg board, in which was recorded all checks written with respect to Monterey's business and all deposits of moneys received with respect to that business. Together with the vendor ledger cards, sales invoices, and bank statements, the peg board provided sufficient information to prepare accurately the Schedules C. Entries on adding machine tapes used by Joseph to prepare the Schedule C for 1988 convince us that Joseph did use the peg board to prepare the Schedule C for 1988. Also, Joseph testified that he looked at statements for Monterey's bank

account to determine bank charges deducted on the Schedules C. Joseph had in his possession, and used, source documents that, we assume, accurately recorded Monterey's income and expenses. The gross discrepancies between entries on the Schedules C and the amended Schedules C convince us that Joseph did not make inadvertent mistakes in completing the Schedules C. We infer from the ready availability to Joseph of accurate information, which he failed to use, a willful attempt by him to avoid his obligation correctly to state his net income from Monterey.

4. Withdrawals of Funds From Monterey

On the amended Schedules C, petitioners reported net profits from Monterey of $94,823 and $69,394 for 1987 and 1988, respectively. When the noncash expense of depreciation shown on the amended Schedules C is added to such net profits, the resulting amounts are $112,492 and $79,804, for 1987 and 1988, respectively. Those amounts coincide with the yearly totals of amounts withdrawn monthly by Joseph from Monterey's bank account and deposited into interest bearing accounts in his own name. We consider such transfers to be some evidence that Joseph attempted to conceal Monterey's income, albeit, ineptly. More importantly, we consider such transfers evidence that Joseph knew very well, not only on a yearly, but on a monthly, basis what Monterey's profits were. Moreover, on the Schedules C, Joseph reported net profits from Monterey of $14,609 and $14,616, for 1987 and 1988,

respectively. Joseph has failed to explain how he could deposit into his personal bank account each year substantially more money from Monterey than he reported as Monterey's net profit and disregard that fact when figuring such net profit.

### 5. Joseph's Lack of Credibility

Joseph was not a credible witness.

Some of Joseph's testimony was as follows: He was not involved in the financial operations of his business, and he had no idea how much money Monterey earned in 1987 and 1988. He did not see the incoming checks, but, rather, the drivers turned in all checks received from customers directly to the secretaries, and the secretaries opened the mail and removed any checks before turning the mail over to Joseph. He had no knowledge as to the bookkeeping method the secretaries used to record the checks. He signed the checks that were sent out to pay bills, but he did not keep track of total expenditures.

Shirley Saunier (Ms. Saunier) was employed as a secretary at Monterey from approximately January or February 1987 until shortly before Thanksgiving of 1987. Ms. Saunier testified as follows: Joseph maintained strict control over Monterey's finances. Joseph received all incoming checks from the drivers directly and opened all the mail and removed the incoming checks. Joseph scrutinized all outgoing checks and accompanying invoices and frequently questioned the secretaries regarding these

transactions. Although the secretaries entered the deposits and disbursements onto the peg board, Joseph reviewed all the entries. We found Ms. Saunier's testimony as to Joseph's extensive involvement with and awareness of Monterey's finances to be consistent and credible.

Joseph testified that he never balanced or reviewed Monterey's bank statements (except when preparing the Schedules C and then only to determine the amount of bank charges) and, therefore, was unaware of how much money had been deposited into the Monterey account. That testimony is contradicted by petitioners' statements on brief: (1) "Mr. DelVecchio each month reviewed his bank statements, and when balances in the business account exceeded the amounts needed to operate the business, Petitioner transferred some of the excess funds to his other account", and (2) "Although Mr. DelVecchio was obviously aware that he was receiving more gross receipts than previous years, it is obvious with his lack of accounting experience that he operated primarily based on his bank balances each month when he received his bank statements."

Joseph testified that he did not use the peg board to prepare the Schedules C. That testimony is false, as shown by our analysis supra section II.C.3.

Joseph's lack of credibility is evidence of his fraudulent intent.

### 6. Joseph's Defense

Joseph claims that he once possessed computer sheets that would demonstrate how he mistakenly understated both his gross receipts and expenses. He contends that such computer sheets are among the records obtained by respondent's agent pursuant to the administrative summons. He further contends that he did not receive back from respondent many of those records, including the computer sheets he needs to defend himself.

In fact, such computer sheets are the only document Joseph has identified as missing. He does not contend that he needs the computer sheets to calculate his gross income and deductions, but rather, that they would serve as proof that he had a reasonable, albeit erroneous, basis for the gross receipts and cost of goods sold he reported on the Schedules C. Joseph did not offer any testimony as to the creation or maintenance of those computer sheets, nor did he produce any witnesses to authenticate their existence. Indeed, he did not explain (1) what information the computer sheets would contain that differed from that appearing on the peg board, (2) the purpose for also running adding machine tapes against the peg board, nor (3) why he would have gone to the effort of maintaining two bookkeeping systems--a manual peg board system and an automated computer system. We do not believe that the claimed computer sheets ever existed.

### 7. Conclusion

Joseph methodically understated gross receipts and cost of goods sold in order to conceal the amount of net profit that Monterey earned; he did that 2 years in a row. According to his own testimony, which, in many respects, was incredible, he had kept what amounted to a second set of books, the computer sheets, which purportedly are missing. Joseph had no explanation for why he maintained two separate sets of books. He moved funds from Monterey's bank account to his personal account. That is the clear evidence that convinces us that Joseph fraudulently intended to understate his income with respect to Monterey for 1987 and 1988.

### D. Portion of Underpayments Attributable to Fraud

Petitioners have failed to rebut the presumption that the entire underpayments in tax for 1987 and 1988 are due to fraud. See sec. 6653(b)(2). We find accordingly.

### E. Additions to Tax For Fraud

We sustain respondent's additions to tax for fraud against Joseph under section 6653(b)(1)(A) and (B) for 1987 and under section 6653(b)(1) for 1988.

## III. Addition to Tax for Negligence

Having found that the entire underpayments for 1987 and 1988 are attributable to fraud, and that Joseph is subject to additions to tax on account thereof, we need not address the

addition to tax for negligence that respondent determined against petitioner Carol DelVecchio.  See sec. 6653(a)(2).

IV.  Substantial Understatement of Income Tax Liability

For returns due before January 1, 1990, section 6661 provides for an addition to tax equal to 25 percent of the amount of any underpayment attributable to a substantial understatement. An understatement is "substantial" when the understatement for the taxable year exceeds the greater of (1) 10 percent of the tax required to be shown or (2) $5,000.  The understatement is reduced to the extent that the taxpayer has (1) adequately disclosed his or her position, or (2) has substantial authority for the tax treatment of an item.  See sec. 6661; sec. 1.6661-6(a), Income Tax Regs.

Petitioners' understatements for 1987 and 1988 exceed 10 percent of the tax required to be shown.  They are, therefore, substantial under section 6661.

Petitioners have cited no authority for their failure to report the understatements of income for 1987 or 1988, nor did they disclose any facts pertaining to such income on their returns or in a statement attached to the returns.  Therefore, petitioners are liable for the section 6661 addition to tax.

Decision will be entered under Rule 155.